R. J. FUCHS and EDWARD E. MURANE,
*Plaintiffs and Respondents,*
vs.
BEN F. GOE, *Defendant and Appellant.*

(No. 2321; November 26th, 1945; 163 Pac. (2d) 783)

For the defendant and appellant the cause was submitted on the brief and also oral argument of R. R. Rose of Casper, Wyoming.

For the plaintiffs and respondents the cause was submitted on the brief and also oral argument of W. J. Wehrli of Casper, Wyoming.

OPINION

RINER, Justice.

This a proceeding by direct appeal from a judgment of the District Court of Natrona County. R. J. Fuchs and Edward E. Murane, the plaintiffs and respondents here, will usually be referred to as the "plaintiffs" or by their respective names. Ben F. Goe, the defendant in the district court and now the appellant may be conveniently mentioned hereinafter either by his own name or as the "defendant". The material facts presented by the record before us and requiring our consideration would appear to be these:

On the 6th day of August, 1942, the parties, R. J. Fuchs and Ben F. Goe, executed an instrument in writing designated "Lease Contract and Option", wherein Fuchs was named "party of the first part" and Goe as "party of the second part." After reciting that Fuchs was then the owner of the "furniture and fixtures, furnishings and equipment used in the night club known as Club LaVida, in the town of Evansville, Wyoming", that the liquor license for the club, and the building and grounds were owned by other parties and that Goe desired to lease the building and premises and also the furniture, etc., above mentioned, the instrument states:

"NOW, THEREFORE, IN CONSIDERATION of the covenants and agreements hereinafter mentioned to be kept and performed by said Party of Second Part, his executors and administrators, the said Party of the First Part has demised and leased to the said Party of the Second Part all of the furniture, fixtures, furnishings and equipment comprising the night club and used in the night club known as Club LaVida in the Town of Evansville, Wyoming; that a detailed list of all of said furniture, fixtures, furnishings and equipment will be taken at the time possession of the premises and the said furnishings are given to party of the Second Part, and at that time said itemized list will be attached to and become a part of this contract by reference thereto."

The period during which the instrument was to be operative was then set out as "from September 1st, 1942, for, during and until September 1st, 1947", and the rental to be paid by Goe to Fuchs for the hire of this personal property was fixed at the sum of $335.00 per month payable in advance on the first of each calendar month. The instrument then provides that:

"And the said Party of the Second Part further covenants with said Party of the First Part that said Second Party has received said personal property in good order and condition, and at the expiration of the time mentioned in the lease will yield up said personal

property to said Party of the First Part in as good order and condition as when they were received by Party of the Second Part, loss by ordinary wear, excepted, and also will keep said property in good repair during the period of the lease at his own expense."

This paragraph may conveniently be referred to hereinafter as "No. 9". Sundry other clauses thereafter follow those quoted above and among these may be mentioned one for an option granted Goe to purchase the property thus leased by Fuchs and also one providing that the instrument should be subject to the approval of the owners of the building and real estate in which the business aforesaid was proposed to be carried on as well as the execution of a real estate lease thereof, by them to Goe of these premises at a specified rental. The remaining provisions of the instrument do not seem at this time to require any particular mention. There was no provision in the contract requiring either party to take out insurance on this personal property and neither one did so. Neither was there any provision therein requiring the lessee to keep and maintain a watchman on the premises.

A few days after the execution of the contract described above Goe took possession of the premises and chattels aforesaid and a list of the personal property taken over under it by Goe was prepared and attached thereto. It is not altogether clear who prepared this list. It suffices to say that in the rather elaborate inventory of chattels it mentioned were the following items:

> "1 roulette table
> 1 roulette checks
> 9 game chairs
> 1 ccrap table
> 1 "21" table
> 3 Table Layouts (above tables)."

These items may, for brevity, be subsequently mentioned as the "gambling equipment".

The day after the agreement between Fuchs and Goe was executed the former and Edward E. Murane, the other plaintiff, signed another contract designated "Agreement for Benefit of Creditors" whereby Fuchs assigned all of his "right, title, and equity" in that agreement, described above, between him and Goe to Murane for the sole purpose of having the latter distribute the proceeds thereof "equitably and equally" to certain creditors of Fuchs as those were shown on a typewritten list attached to this subsequent contract.

The town of Evansville in which this night club building and business was located is about three to three and one-half miles from the city of Casper, Wyoming. Goe continued to operate the business from the 26th of September, 1942, when the place was opened to the public, until March 10, 1943. On the last mentioned date the building, aforesaid, with all of its contents, except what had been placed in a "west room" (as the record describes it) where the fire was "cut off" by the efforts of both the Casper Fire Department and the Natrona County fire fighting force, was destroyed by fire. There was also certain other property saved, all of which was subsequently removed and deposited by Goe in a Casper warehouse, and Fuchs was notified by letter from Goe, under date of March 31, 1943, that is was so deposited for Fuchs' disposal and subject to the latter's order. Goe's letter of notification to Fuchs stated that it would "be your authority when presented to the" warehouse company "to take possession of the items of property so stored". The items of gambling equipment, aforesaid, were apparently not in the building when the fire occurred. By a stipulation of the parties, signed March 22, 1944, it was agreed that this gambling equipment, aforesaid, which had been delivered to the warehouse mentioned above by a party other than Goe might be turned over forthwith to the plaintiff, Fuchs, provided such delivery or the making of this agreement

should not affect the asserted rights of the parties *except* that "if plaintiffs, or either or both of them, recover any judgment in this cause against defendant, the amount which might otherwise be recovered shall be reduced $675.00 on account of delivery of the property hereinabove described."

A large part of the chattels leased by Fuchs to Goe having been thus destroyed by the fire and not being returned to the former, he brought an action in the district court above mentioned to recover the value of this property from the lessee. The important portions of plaintiff's petition in its first cause of action relying on paragraph "No. 9" in the instrument hereinbefore described, pleaded that "the said defendant, Ben F. Goe, under and by virtue of the terms of said contract became, was and is obligated to return said personal property to the plaintiff, R. J. Fuchs, loss by ordinary wear excepted", and "That the defendant, Ben F. Goe, has refused to replace the personal property described in the contract, Exhibit A, and which belonged to the plaintiff, R. J. Fuchs, at the time of its destruction, or to pay the plaintiffs the value thereof, and that because of the destruction of said personal property defendant is unable to return the same to the plaintiffs, all to the plaintiff's damage in the sum of $15,000.00. That defendant paid the rental upon the Lease Contract and Option, Exhibit A, to and including the month of March, 1943, but has not made any rental payment since."

The second and remaining cause of action of this petition was in tort, based on the alleged facts that the Town of Evansville had no fire fighting equipment, the nearest available source of this aid being the fire department of the city of Casper, and the nature of the business of conducting a night club where many people were present and food was prepared for them "during

the night hours and into the early morning hours" and where they were allowed to and did smoke and the "drapes, carpeting, and decorations" being "highly inflammable"; that defendant, knowing these facts kept someone in the premises all night every night during his entire occupancy thereof from August 6, 1942, "until within a few days shortly prior to the occurrence of the fire, the exact time being unknown to plaintiffs, when said defendant negligently discontinued the keeping of a watchman or person in said premises all night, and that by reason of such negligence on the part of the defendant fire broke out in said premises about three o'clock in the morning of March 10th, 1943, that there was no one there to detect the presence of fire or to report the same promptly, and that by reason thereof it was about five o'clock in the morning of said day before fire fighters and fire fighting equipment arrived at the scene, and the fire had then made such progress that its course could not be arrested, and as a result the property of the plaintiff, R. J. Fuchs, was destroyed as hereinabove alleged". Allegations are then set forth to the effect that the defendant has refused to replace the leased personal property, aforesaid, or to pay for it to plaintiff's damage in a specified sum.

Defendant's answer to the alleged first cause of action in the petition, aforesaid, was in substance a general denial and averments that the instrument on which plaintiffs' first cause of action was grounded was "a contract in furtherance of gambling in violation of the laws of the State of Wyoming and intended by plaintiff Fuchs and defendant so to be, and was entered into by the parties thereto with the knowledge, intent and purpose on their part that the said personal property should and would be used for the purpose of gambling in violation of the laws of the State of Wyoming, that gambling was and would be the principal source of income and profits from the operation of the so-called

night club mentioned in plaintiff's petition, and that without the operation of a gambling room in said club the same could not be operated successfully".

The defense interposed to the second alleged cause of action may be summarized as a denial of any negligence on the defendant's part in the employment of a watchman and allegations "that from the time he took possession of the premises alleged in plaintiff's amended petition until the time of the fire therein alleged, he had in his employ a man who served as janitor and watchman", and defendant "avers that the said club operated by him was usually kept open until long after midnight and until the said employee went on duty, and says that on the tenth day of March, 1943, the day of the occurrence of said fire, defendant's said place of business, because of the absence of patrons, was not kept open as late as usual and was closed before his said employee arrived".

There was a reply filed by plaintiffs denying the affimative matter set forth in the answer. A cross petition by defendant and an answer thereto by the plaintiffs appear in the pleadings of the parties but as these do not seem to be involved in this appeal it will be unnecessary to review or discuss them.

The material proofs submitted to the trial court under the foregoing averment will be mentioned and considered hereinafter in connection with our discussion of the contentions of the parties upon the record before us.

The case was tried to the court without a jury on September 26, 1944, and on October 12, 1944, a general finding in plaintiff's favor was made followed by a judgment that certain personal property owned by the plaintiff, Fuchs, which was not destroyed by the fire and hereinbefore mentioned but which had been stored

after that occurence by Goe in a designated Casper warehouse, should be delivered to said plaintiff, Fuchs, subject to a lien in favor of Edward E. Murane, as trustee for Fuchs' creditors; and that plaintiff, Fuchs, recover also from the defendant, Goe, the sum of $5200.00; and that upon this sum a lien was also adjudged in favor of Murane in his capacity as trustee, aforesaid, the amount of this lien upon both said personal property and the money judgment being fixed at $4799.23.

From this judgment an appeal was taken by Goe and from all of it "excepting that part thereof wherein it is adjudged that plaintiff R. J. Fuchs is the owner of the personal property stored in the warehouse of the Natrona Transfer, Storage and Fuel Company in Casper, Wyoming".

As may be gathered from defendant's answer reviewed above, Goe, in the district court, contended, as he does now, tha the contract on which plaintiffs' first cause of action is predicated, is illegal and unenforcible in it entirety because of the few items of gambling equipment which were included in the elaborate list of personal property which Fuchs leased to Goe.

Considering the point of law thus raised, abstractly, and aside from the record in this case we find that upon ample cited authority, most of the courts of this country as distinguished from the view entertained by the English and a few American courts, 13 C. J. 517-518, § 476, says:

"have held that the mere knowledge of the seller of goods or services, or of the vendor or the lessor of property, that the buyer intends an illegal use of them is no defense to an action for the price or for the rent, provided he did nothing in furtherance of the unlawful purpose. According to this doctrine it is no defense" that "a person doing work in and fitting up and furn-

ishing a house knew that it was to be used and occupied as a gambling house; that a seller of goods or the lessor of premises knew that the buyer or lessee intended to use them for gambling purposes."

See also 17 C. J. S. 681, § 293, where this statement of the rule is substantially reiterated.

In 32 Am. Jur. 68-69, § 49, the text is of similar import, saying:

"According, however, to the weight of authority in this country the mere fact that the lessor may know or have information leading him reasonably to believe that the lessee will use the premises for an illegal purpose will not render the lease illegal so as to prevent the lessor from recovering the rent by legal proceedings if he did not agree that the premises be so used or let for that purpose; that in order to defeat a recovery for rent by the lessor it must be shown that he participated in some degree, however, slight, in the wrongful purpose and intended that the property be so used, and that mere indifference on his part as to the intended use of the premises is not sufficient to bar his recovery. Mere knowledge on the lessor's part that the lessee will use the premises for an unlawful purpose does not make the lessor a participant in that purpose; for mere knowledge that the lessee may or will use the premises for an unlawful purpose is not of itself sufficient to show that the lessor intended that they must or shall be so used."

Our case of Perko vs. Rock Springs Commercical Co., 37 Wyo. 98, 259 Pac. 520, deals with an action which was brought to recover the price of certain barrels and grapes sold by the plaintiff to the defendant during the days when the prohibitory law against the making or possession of intoxicating liquor was in force and the defense was interposed:

"that at the time defendant ordered the grapes plaintiff, as part of the contract and the consideration for the sale thereof, 'warranted the same to be fit and proper for making wine, and intoxicating liquor, prohibited

by the laws of the State of Wyoming and the laws of the United States;' that plaintiff sold and delivered the same, as well as the barrels, knowing at the time of said sale and delivery that the grapes were to be made into wine and intoxicating liquor, the making and possession thereof being prohibited by the laws of the State of Wyoming and of the United States, and that the barrels 'were to be used as the container' of said wine in the process of making it."

Ruling adversely to this contention it was said:

"Counsel for both parties appear to agree that the law governing the facts shown by the record is, as stated by 23 R. C. L. pp. 1317-1318, Sec. 134:

'The authorities are not in entire accord as to the effect of the seller's knowledge merely that the buyer intends to use the subject matter of the sale for an unlawful purpose. The better rule is that a contract of sale is not rendered illegal merely because the seller had knowledge of such fact if he did not participate in the intent to commit the illegal act or by some affirmative act aid in the furtherance of such unlawful purpose or have some interest in the performance of the illegal act.'

"See extensive list of cases cited in the foot note appended to the text. To the same effect is 13 C. J. 517, Sec. 476, and cases there referred to from some twenty-four state and federal jurisdictions.

"Our examination of the authorities leads us to think this a correct statement of the law, though crimes of great magnitude are of course excepted from the operation of the principle. Haneuer v. Doane, 12 Wall. (U. S.) 342, 20 L. Ed. 439."

Professor Williston, in 6 Williston on Contracts (Rev. Ed.) 5060, § 1779, says that:

"It was early decided that where some covenants of an indenture are legal and others illegal the legal covenants may be enforced. This is the simplest form of the problem of partly illegal contracts. If legal consideration has actually been given and a unilateral con-

tract formed, or if the promises are under seal and binding without consideration, the rule thus early established has never been questioned."

Recurring now to the record before us we find that the plaintiff, Fuchs, testified that he was out at the night club the second night after Goe opened for business and at other times after that and that none of the gambling equipment, aforesaid, was in the night club premises; that he, Fuchs, later on saw the roulette table up at Riverton, Wyoming. Goe, himself, testified that he brought gambling equipment, including a roulette table from his place in Jackson, and installed it in the night club here involved the very day he opened the place for business; that the roulette chips and crap table which were listed in the lease, aforesaid, were not used by him at all but put in a storeroom; that the roulette wheel thus listed was in the gambling room of the night club until the latter part of December, 1942, when it was removed and placed elsewhere. He does not state that this wheel was ever in use.

From this evidence taken in its entirely it is evident that the trial court could fairly conclude that the gambling equipment embraced in the list of chattels leased was never used by Goe in carrying on the business of gambling, and that he used his own paraphernalia instead. Fuchs testified also on cross-examination that the lease was entered into without knowledge on his part that Goe was to run a night club including gambling. But assuming that he did have such knowledge under the authorities cited above, that fact without more does not invalidate the lease. There is no evidence that has been called to our attention showing that he participated in the profits from the gambling or that he in the least, actively encouraged or engaged in the illegal practices which Goe conducted in connection with the night club business.

In addition it will be remembered that the action in the district court was not for the recovery of any rent stipulated for the leased property. It was simply upon covenants in substance to return the personal property in as good condition as when received by Goe and to keep it in repair. These were not illegal covenants that we can see and the rule suggested by Professor Williston, supra, would seem to be applicable. As we look at the matter, it would appear to be a harsh rule if an action for the recovery of the value of property stated by plaintiff, Fuchs, to be over $14,000, must fail because a few items of gambling equipment, also valued by him at $850.00 and which were never used by the lessee, were included in the list of leased property. Indeed, it would seem, from the stipulation of the parties under date of March 22, 1944, and hereinbefore reviewed, that this gambling equipment had been returned to Fuchs long before this case was tried and so had thereby been removed from the controversy entirely. Counsel for defendant at the argument, as we understood it, conceded that it was not included in the trial court's judgment here in question.

We are unable therefore to sustain the defendant Goe's contention on this breach of the case.

At the argument before this court our attention was called on behalf of the defendant to the case of Lake Shore, etc., Ry. Co., vs. Barnes, a jury case, 166 Ind. 7, 76 N. E. 629, as applicable here. That decision was to the effect that where evidence is admitted to support a cause of action alleged in such a way that a demurrer thereto had been erroneously overruled the judgment should not be permitted to stand on review thereof unless it affirmatively appears to have been founded on a good cause of action included in the pleading thus questioned. It is not necessary to decide the point, for we think that this matter is one which should have been

called to the attention of the trial court at the time judgment was entered. If that had been done undoubtedly the record would have been cleared on the matter. Section 89-1321, W. R. S. 1931, requires a request for special findings of fact, otherwise a general finding must stand as sufficient. See Hilliard vs. Douglas Oil Fields, 20 Wyo. 201, 213, 122 Pac. 626; Sewell vs. McGovern, 29 Wyo. 62, 73, 211 Pac. 96. The same principle would seem applicable here. So the error, if error there was, we consider to have been waived and should not be regarded as prejudicial.

It is contended for the plaintiffs that the appellate proceedings here should fail because the defendant, Goe, did not appeal from the entire judgment rendered by the district court, but excepted from the appeal that part of it wherein it was adjudged simply that Fuchs was the owner of the personal property stored in the Casper warehouse after the fire. There was no controversy on that point in this litigation that we are able to perceive and the cases of Cottier vs. Sullivan, 47 Wyo. 72, 31 Pac. 2nd 675, and F. E. Warren Mercantile Co. vs. Myers, 48 Wyo. 232, 45 Pac. 2nd 5, are, hence, inapplicable. We regard the point urged as without merit.

The contract involved in this litigation was entitled as recited above as a "lease". But it was not a lease in which real property was included. What it really was, was a bailment for hire for the mutual advantage of the parties, i. e., a hiring of personal property for a stated period of time and for a monthly sum of money for its use. A hiring of personalty for a fixed term is nevertheless a bailment although the hirer has an option to purchase the property before the expiration of the term. 6 C. J. 1100, Note 20, and cases cited. Schouler's Bailments and Carriers (3rd Ed.) § 130, et seq; Van Zile Bailments and Carriers (2nd Ed.)

§ 119 et seq. In Dobie on Bailments and Carriers 98, § 44, it is said:

"Locatio, or hiring, is a bailment in which compensation is to be given either by the bailee to the bailor for the use of a thing (locatio rei) or by the bailor to the bailee for labor and services about a thing (locatio operis)."

The degree of care to be exercised by a bailee in a bailment for mutual benefit is placed by the law at ordinary care. So the text last cited, in § 53, declares that:

"Since a locatio rei is a bailment for the mutual benefit of the bailor and bailee, the bailee must exercise ordinary care in using and keeping the hired chattel. The legal duty of the bailee having been thus fixed, any breach of that duty is negligence, which renders the bailee liable to the bailor for any damage thereby proximately occasioned. Ordinary care, however, in the absence of the bailee's active wrongdoing or *special contract*, is the full measure of the bailee's duty. When this duty has, therefore, been fulfilled, the bailee is not responsible for any loss or damage to the bailed chattel, regardless of how it happened. When loss or damage occurs, then, the apposite inquiry is: Was such loss or damage due to the bailee's negligence—that is, to the failure of the bailee to exercise ordinary care?" (Italics supplied.)

And in 4 Williston on Contracts (Rev. Ed.) 2905, § 1041, the learned author states that "it is now the recognized rule that a hirer is bound only to ordinary or reasonable care". A special contract between the parties may, of course, either enlarge or limit the obligation of the bailee as it ordinarily would be under the general law. 6 C. J. 1111, 1112, §§ 43 and 44.

The contention of the bailor, Fuchs, in this case is that by the covenants in the special contract pleaded as set forth above the liability of the bailee, Goe, was distinctly enlarged. These covenants briefly stated

were, (a) that Goe should return the hired property in as good condition as when received by him, loss by ordinary wear excepted, and also (b) to keep that property in good repair during the term of the contract. The duty of only ordinary care to be exercised by the bailee implied by the law, it is now asserted by the plaintiffs, has been so changed by these covenants as to make him an absolute insurer of the chattels he hired and, hence, upon their destruction by fire, even without his fault, he is bound to pay to the bailor their value.

The attitude of the courts relative to enlarging or limiting the effect of the obligations of the parties imposed by law under contracts of bailment is thus stated by 6 Am. Jur. 276, § 180:

"In provisions of a contract under which the ordinary obligations of bailment are enlarged or restricted should be specific and clearly expressed, for as a rule the courts are reluctant to limit, or to extend, rights or liabilities which the law generally attaches to such a relation, unless pursuant to a manifest intention of the parties as expressed in, or necessarily implied from, their contract. The liability of the bailee, for example, may be greatly varied by special contract, but it is not to be enlarged or restricted by words of doubtful meaning."

"In determining the scope of the terms of the agreement", says the United States Court of Appeals (2nd Cir.), in Mulvaney vs. King Paint Mfg. Co., 256 Fed. 612, "contracts of bailment should not be enlarged beyond their plain meaning to impose further liability upon the bailee. A covenant to insure should never be implied, and should be imposed only where it is found in the agreement by clear and explicit language. Story on Bailment, § 35". To the same effect is Ames vs. Beldon, 17 Barb. (N. Y.) 513.

Relative to covenant "(a)", supra, it may be observed that 6 Am. Jur. 277, § 182, states that:

"According to the view supported by the apparent weight of authority, an intention to enlarge the common-law liability of the bailee is not indicated by the mere stipulation, unaccompanied by the assumption of some additional obligation such as an agreement to pay for the property in the case of nondelivery, that he agrees to return the subject of the bailment in good condition, or in as good condition as when received, ordinary wear and tear excepted. There are, however, decisions in some jurisdictions which apparently support a contrary rule."

Professor Williston would seem to take the same view as expressed in the text last cited for in 4 Williston on Contracts (Rev. Ed.) 2908, § 1041, he says:

"The duties of the hirer are to return the bailed property in as good condition as when received, necessary wear and tear excepted, unless injured without his fault, and to pay the agreed compensation."

To this statement he appends a note stating, "The general view is that where a contract of bailment for hire contains a promise by the bailee to return the chattels in as good condition as when received, it is merely declaratory of the relational obligation to use reasonable care for their preservation."

So, also, we find the United States Circuit Court of Appeals for the Ninth Circuit ruling in Cary-Davis Tug & Barge Co. v. Fox, 22 Fed. 2nd 64. There a contract provided for the installation of fresh-water steel tanks in a tug boat, and the contractor doing the work agreed that "the whole job will be completed by" him "and the tug returned to the owners in as good condition as it is to-day". The tug was badly damaged by fire. It was contended that under this express provision of the contract between the parties the contractor assumed liability irrespective of negligence but the court, dismissing the owner's libel to recover the cost of the repairs necessitated by the fire, said:

"Nor is there any merit in the contention that the appellees are liable, regardless of negligence, under the terms of the contract. No doubt a bailee may enlarge his liability by contract, but the provision that the tug should be returned in as good condition as it was that day is a familiar one in leases, charter parties, and other contracts, and almost without exception the courts have held that such provisions are simply declaratory of the obligation implied by law."

In Sanchez vs. Blumberg, 176 S. W. (Tex. Civ. App.) 904, a mule let for hire was not returned due to the fact that it had drowned without the fault of the hirer. It was insisted that an agreement by the hirer to return the animal is as good condition as when received "the natural use and wear excepted" made him an insurer of the animal, and that he was liable for its value. Rejecting this contention and affirming the trial court on this particular point in the case, this was said:

"The parties to a bailment may substitute a special contract for the one implied by law. The bailee may be relieved of all liability or he may become an insurer, but his liability is not to be enlarged or restricted by words of doubtful meaning. The intent to vary the liability imposed by law must clearly appear. Hale on Bailments, p. 28. According to the weight of authority, an agreement by the bailee to return the bailment in good condition, or in as good condition as when received, ordinary wear and tear excepted, does not, in the absence of a stipulation to pay in case of nondelivery, indicate an intention to enlarge the common law liability of the bailee. Ruling Case Law vol. 3, § 30; note to Grady v. Schweinler, 14 L. R. A. (N. S.) 1091. We hold that the contract sued upon in this case did not constitute plaintiff an insurer of the mules. As the relation of bailor and bailee existed for the mutual benefit of the parties, it devolved upon the bailee to use ordinary care and diligence in the safeguarding of the bailor's property. The trial court took the view of the law above indicated as is shown by the charge * * *".

See also Meek vs. Andrews, 17 Oh. Cir. Ct. (N. S.) 141; Sawyer vs. Wilkinson, 166 N. C. 497, 82 S. E. 840;

Gouled vs. Holwitz, 95 N. J. Law 277, 113 Atl. 323; 22 Col. Law Rev. (1922) 74; Cleaver vs. Drake-Brannum Const. Co., 195 S. W. (Tex. Civ. App.) 206; Kohlsaat vs. Parkerburg & Marietta Sand Co., 266 Fed. (C. C. A. 4th Cir.) 283; Warren & Arthur Smadbeck, Inc., vs. Heling Contracting Corp., 50 Fed. 2nd. (C. C. A. 2nd Cir.) 99.

. Under the foregoing listed authorities it is evident that cases like Sun Printing Co. vs. Moore, 183 U. S. 642, 46 L. Ed. 366, 22 S. Ct. 240, where the covenant was that the hirer shall be liable and responsible for any and all loss and damage to the property hired, which was a yacht, with other provisions of similar character; Sams vs. Cochran & Ross Co., 188 N. C. 731, 125 S. E. 626, where also there was an agreement on the bailee's part to be "responsible" for any loss occurring; Grady vs. Schweinler, 16 N. Dak. 452, 113 N. W. 1031, where the provision was "to return the chattel or pay for it" and all other decisions based on special agreements of similar character may be laid aside as not in point for in these cases language was employed clearly indicating that it was the intention of the bailee to make himself an insurer of the property involved.

But, relative to covenant "(b)", supra, it is urged that "the contract in this case clearly makes defendant an insurer, because it contains both a covenant to keep in repair and one to deliver the property in as good order and condition as when received, loss by ordinary wear excepted". And that "Under contracts containing both covenants, we have found no authority holding otherwise than that the bailee or lessee becomes an insurer."

We approach these contentions with the remark that this matter with us is one of first impression in this jurisdiction and we deem it our duty to so construe the

terms of the covenants in question as will, under conditions prevalent in this commonwealth, establish a fair and just legal principle, the cardinal rule in the construction of contracts being always kept in mind that the intention of the parties, as exhibited by the language they have used shall govern.

Our attention is invited by plaintiff to cases which follow the doctrine of the common law in the interpretation of a covenant on the part of a tenant of real property to repair the demised premises. Aside from any covenant or agreement to repair, a tenant was not bound to make any repairs not caused through his fault or negligence. But the rule of the common law in construing a covenant to repair the premises leased was firmly established centuries ago that such an agreement to repair obliged the tenant to re-build the buildings although they were destroyed by fire or other accident and without fault or negligence on his part. The early and subsequent decisions merely say that if he desired to relieve himself from such liability he had to do so by excepting that character of responsibility from the operation of his covenant.

The old and oft cited case of Bullock vs. Dommitt, 6 T. R. 650, 101 Eng. Repr. 752, decided in 1796, dealt with a covenant on the part of the lessee that "he his executors administrators and assigns would during the term of twenty-one years when, where and as often as need or occasion should be and require at his and their own costs and charges repair uphold support maintain amend and keep the said messuage and premises in needful and necessary repair, etc." The defendant pleaded in defense in an action on the covenant that the building had been accidentally destroyed by fire. This plea was held bad on demurrer, the Chief Justice saying "On a general covenant like the present, there is no doubt but that the lessee is bound to re-build in

case of an accidental fire; the common opinion of mankind affirms this, for in many cases an exception of accidents by fire is cautiously introduced into the lease to protest the lessee." The Associate Judge remarked that "This liability of the tenant is founded on the old law; it is so laid down in. Bro. Covenant pl. 4; referring to 40 Ed. 3, 5." Thus it is plain, as pointed out in 2 Platt on Leases, pp. 186-187, that this construction which that text says has since been uniform in England, harks back to the time of Edward the Third whose reign was during the years 1327 to 1377.

The status of English society in which this rule of construction of leasehold covenants took its root and its contrast with the conditions prevailing in the country in the latter part of the nineteenth century—and we may add, at the present time—has been very aptly described by Mr. Justice Brewer in Whitaker vs. Hawley, 25 Kan. 675, where he said:

"The feudal system shaped and modified the common law concerning real estate. Land could not be taken on execution. Alienation was difficult and expensive. The landlord was but the successor of the ancient feudal lord, and his rights were correspondingly sacred; but now the holder of real estate has little or no vantage over the owner of personal property. The distinctions growing out of the feudal system are disappearing, and this distinction between the lease of real property and the hiring of chattels is one which sooner or later will cease to exist. Insurance, now so common, works a change in the relative position of the parties. Formerly the landlord was to a great extent at the mercy of the tenant, who might put an end to his liability by firing the building, and being in possession could do it easily and without probability of detection. The burden of such a loss would fall upon him who had so little means of prevention or detection; hence one source of protection was to continue the liability for rent. But to-day the rule is insurance."

That case criticises the common law rule holding a

tenant to the payment of rent after that which makes the contract of value to him has ceased to exist.

We may mention that we have by statute, as is well known, adopted the common law so far as same is of a general nature and not inapplicable in this state, Sec. 26-101, W. R. S., 1931. The meaning of the word "applicable" in such a context has been thus defined: The Supreme Court of Illinois in Seeley vs. Peters, 5 Gilm. 130, said "that in adopting the common law, it must be applicable to the habits and condition of our society, and in harmony with the genius, spirit, and objects of our institutions." This language the Supreme Court of Iowa, in Wagner v. Bissell, III Clarke (Ia.) 396, 402, approved, remarking "and we see no just or fair objection to this view of the subject." Chief Justice Shaw, relative to Massachussetts law, in Going vs. Emery, 16 Pick. 107, said:

"What English statutes are deemed to be in force here, is often a question of difficulty, depending upon the nature of the subject, the difference between the character of our institutions, and our general course of policy, and those of the parent country, and upon fitness and usage."

We find the same rule has been announced in substance in the State of Ohio where, in Lindsley vs. Coats, 1 Ohio 243, it was laid down as follows: "It has been repeatedly decided by the courts of this state, that they will adopt the principles of the common law, as the rule of decision, so far only as those principles are adapted to our *circumstances, state of society, and form of govment.*"

The American courts generally appear to have adhered to this ancient rule of construction of such a leasehold covenant. One of the earliest cases in this country in which judicial opinion frequently refers is Phillips vs. Stevens, 16 Mass. 238, decided in 1819.

That case also was a suit on a covenant "that the defendant would keep in repair, support and maintain all and singular the fences and buildings, saving and excepting the natural decay of the same, as should be needful, at his own proper cost and charge; and at the end of said term, or other certain determination of said lease, whichever should first happen, would quietly leave, surrender and yield up the premises, in as good condition as the same were in at the date of said indenture, reasonable use and wearing thereof excepted." The plea interposed was to the effect that the house and fences were destroyed by fire during the term "without the default, and against the will of the defendant". On demurrer the plea was adjudged bad. The authorities cited for the plaintiff were all English cases including Bullock vs. Dommitt, supra, excepting an earlier Massachussetts case, Fowler & Al. vs. Bott & Al. 6 Mass. Rep. 63, dealing with the question of rent after buildings included in the term had been destroyed by fire. Referring to these cases the court said:

*"Whatever may be thought of the merits of the doctrine they maintain, when first established,* there is no escape from it now, until the legislature shall see fit to alter the law, which it is hardly probable they will ever do; since the parties may always protect themselves against it, by due caution in making their contracts.

"A formal opinion, in a case so free from doubt, and so well settled in the books, would be unjustifiable; were it not for the ignorance, generally prevailing in the country, of the legal effect of covenants in leases and other instruments, which are often executed without any particular inspection or knowledge of their contents; *and thus people are surprised into contracts, which neither party intended, when the instrument was executed."* (Italics supplied.)

The opinion concludes with these words:

"Men must be more cautious in making their contracts, and not rely upon the hardship of their cases to

relieve them, when they are brought into difficulty. Such mistakes rarely occur in *England,* although there is a court of equity there which may sometimes relieve in such cases. *With us there is no such authority. The law must have its course, and the citizens must take care of themselves in making their bargains.*" (Italics supplied.)

But all the courts and legislative bodies in the nation have not been so acquiescent in this ancient rule of construction promulgated by the common law, as the following discussion will demonstrate. The lawmaking authorities in a number of states of the union have deemed it wise to change, by legislative fiat, the severe views in interpreting leasehold covenants of the character here involved as expressed by the several decisions mentioned above. Statutes of this character in the states of Maryland, West Virginia, Kentucky, and Mississippi, (1 Tiffany Landlord and Tenant 777, Note 1034) have been enacted. While some of these statutes are broader in their terms than others they have, in substance, undertaken to make the rule of construction of such agreements in those states conform to the modern principles so well expressed in Zeibig vs. Pfeiffer Chemical Co., 150 Mo. App. 482, 131 S. W. 131, in these words:

"The rule of construction which obtains with regard to express covenants in leases requires them to be interpreted according to the obvious intention of the parties as collected from the whole context of the instrument and in consonance with the reasonable sense of the words employed. Furthermore, such express covenants are to be construed more strictly than those which are implied, for when parties have entered into an agreement with express stipulations touching a particular subject-matter, it is presumed that they have expressed all of the conditions by which they intend to be bound, and the courts will not extend their covenants by interpretation unless the implication is clear and undoubted. (1 Taylor on Landlord and Tenant (9 Ed.), sec. 256; 1

McAdam on Landlord and Tenant (3 Ed.), p. 364; Smiley v. McLauthlin, 138 Mass. 363, 364, 365.)"

In Willis vs. Wrenn's Ex'x., 141 Va. 385, 127 S. E. 312, it was pointedly declared, with reference to the common law rule of construction, aforesaid, that:

"Even while the common-law doctrine was in force in this state, it was deemed a harsh, if not unreasonable, rule, and the courts refused to extend it beyond what was required by the language used."

And the case of Maggort vs. Hansbarger, 8 Leigh (35 Va.) 532, was cited in support of the statement. Judge Parker, in the case last mentioned, remarked concerning the earlier case of Ross vs. Overton, 3 Call (7 Va.) 309, that it "was considered at the time a doubtful case, although Ross had expressly covenanted to deliver the mill and other improvements 'at the expiration of the said term of seven years, in proper tenantable repair'." Referring to the English case of Bullock vs. Dommitt, supra, and Phillips vs. Stevens, supra, he remarked that "even where there were such express covenants to repair, it has seemed to some a strained and doubtful construction to extend them to the case of rebuilding". Concerning the liability imposed upon a tenant by this rule of construction of the common law his views were:

"Such a risque is scarcely ever contemplated by either party, and the tenant receives no premium for the insurance. Were he asked, at the time of making a contract and giving a fair rent for the property, 'do you mean, if it is destroyed by fire or tempest, to rebuild or repair it?' he would be startled at the bare question: and the landlord himself, to the same enquiry, would unquestionably answer that he expected nothing so unreasonable. To bind him to something so unequal, and so contrary to the obligations imposed upon him by the common law, I think his covenant ought to be special and express, and so clear as to leave no doubt that he intended to take this duty or charge upon himself.

Nothing should be left to vague inferences or doubtful construction."

The case of Realty & Rebuilding Co. vs. Rea, 184 Cal. 565, 194 Pac. 1024, is instructive. There the lease required the lessees to "repair and keep in good order, condition and repair the whole of said premises at their own cost and expense" and also to surrender the premises "in as good state and condition as the same are now or may be put into, reasonable use and wear thereof, and damages by the elements, excepted." The case decided that neither of these covenants required the tenants to rebuild a building entirely destroyed by fire without their fault, though to reach this result the court was obliged practically to overrule the earlier case in that jurisdiction of Polack vs. Pioche, 35 Cal. 416, decided in 1868, where the severe rule of the common law we are considering was approved. In the course of the opinion in the Rea case this was said:

"The extent of the liability of the lessees in respect to the damages in question is therefore dependent entirely upon the interpretation of the terms 'repair' and 'keep in repair'. These terms are not technical nor is there anything to indicate that they were used in any technical or special sense or in accordance with any special usage. A general covenant to repair on the part of the tenant is, as stated in Polack v. Pioche, supra, binding unless limited by express exception, but such a covenant, even if it be in the most general terms, does not constitute an agreement to rebuild unless the term 'repair' means also to replace. It has no such meaning in its normal sense. To repair means to mend an old thing, not to make a new thing; to restore to a sound state something which has become partially dilapidated, not to create something which has no existence."

Commenting on this decision, 10 Calif. L. Rev. 44, 45, says that "It is, of course, not a light thing to overrule doctrines established by earlier decisions, particularly in property law; but few, we think will be found to

grieve for the death of so technical a doctrine as that of Polack vs. Pioche."

The covenants of a certain lease were:

"That, at the expiration of the term above granted, * * * he will quietly and peaceably yield up possession of said premises * * * in as good condition as the same were when entered upon, ordinary wear or damage by fire excepted. * * * It is understood and agreed that the buildings in the above-described property have been placed in good repair by (the lessor), and shall be kept in the same condition by (the lessee) during the term of this lease, natural decay and wear and tear excepted."

It appeared that during the term all the buildings on the demised premises were entirely destroyed by a violent wind storm. The lessor contended that the lessee was bound under the aforesaid covenants to re-build the ice houses used in harvesting ice. The trial court upheld this contention. Reversing this ruling the appellate court, in Wattles vs. South Omaha Ice & Coal Co., 50 Neb. 251, 69 N. W. 785, said in part:

"The lessee accepted his lease, and entered upon these premises, to use them solely for the purposes of harvesting and storing ice. When he did so, he stipulated that the leased premises were in good repair, in good condition, and he promised that he would keep them in good repair, and at the expiration of his lease so surrender them. What did the parties to this contract understand and intend by the terms 'repair' and 'keep in repair'? These words 'repair' and 'keep in repair' are not technical words, nor should they be given a technical or strained interpretation. They should receive their ordinary interpretation. To repair, as it is ordinarily used, means to amend, not to make a new thing, but to refit, to make good or restore an existing thing. See Todd v. Inhabitants, 8 Allen, 51; Stephens' Ex'rs v. Milnor, 24 N. J. Eq. 358. When we speak of repairing a thing, the very expression pre-supposes something in existence to be repaired. If a carpenter contracts to repair a house, a mason a chimney, the

ordinary construction of these contracts would not be that these parties had agreed to build a new house or a new chimney. If the construction of the lessee's covenant contended for by the appellee here be correct, then, had this entire tract of land and its buildings been swept away by a flood of the Missouri river, the lessee would be liable for their value to the lessor. Before we can say that a lessee assumed the liability of any such a contingency as that supposed, we must find his assumption of such a risk in the clear and express language of his contract."

In Orient Ins. Co. vs. Pioneer Mill Co., Ltd., 27 Haw. 698, the covenants in the lease of the premises on which a certain building was located were: the lessee "will keep all buildings, structures and erections now on the demised premises in good order and repair; * * * and that it will at the expiration or sooner determination of the lease deliver up to the lessor said premises with all improvements and erections thereon." That building was, through no fault or negligence on the part of the lessee, entirely destroyed by fire. The question posed by the demurrer to the complaint in the action brought to recover for this fire loss certified to the appellate court and considered by it, was:

"Was it the intention of the parties, as expressed in their written agreement, that, in case the building upon the demised premises should, during the term, be accidentally destroyed, the lessee should rebuild the same or be liable in damages to the lessor for the value of the destroyed building?"

After surveying at some length the decisions answering this query in the affirmative the court reviews them thus:

"That these authorities in reaching the conclusion that a covenant to repair is equivalent to an express covenant to rebuild have done so by a strained construction seem all the more apparent when it is noted that it is generally held that, a covenant to deliver up the premises to the lessor in the same or as good condition as

they were in when received, creates no obligation to rebuild in case of destruction by unavoidable casualty, but it is a mere covenant against holding over. To the ordinary mind there would seem to be far more reason to construe an unqualified covenant to return an article in the same condition as it was when received as obligating the covenantor to in fact perform his covenant, than to construe a covenant to repair as an absolute covenant to rebuild, yet, as remarked by the court in Warner v. Hitchins, 5 Barb. 666, 'In all those cases in which the same lease has also contained a covenant to surrender the premises in the same condition, or in as good condition, as at the commencement of the term, this covenant has not been noticed by the court as important, but the covenant to *repair* has been made expressly the basis of the recovery.' * * * It must be conceded, that the authorities cited go, to what appears to us, an extreme length in holding that a lessee, who has covenanted to keep the demised premises in repair, has bound himself absolutely to rebuild a structure that without fault on his part is destroyed by unavoidable accident. But, in admitting the length to which these authorities have gone when construing the particular documents before them, does this mean that in *all* cases involving the construction of leases the courts are bound to such a harsh construction?"

Concluding its opinion the following very cogent language, as we think, was employed:

"If the parties to the present lease intended that the word 'repair' was to be given other than its ordinary meaning and the lessee was to become an absolute insurer, obligated to rebuild under all circumstances, why should such a serious obligation have been expressed in anything but the plainest of terms? In other words, if it was the intention of the parties that, in case the building should, during the term, be destroyed, the lessee would rebuild the same, why should that intention not have been clearly and unequivocally expressed and not hidden under the apparently innocent promise on the part of the lessee to keep the building 'in good order and repair'?

"Whatever meaning may have been placed by courts upon the words 'repair' or 'keep in repair' when construing the various instruments in which those terms were used, is not of controlling weight, for, after all, in the construction of written instruments, precedents are of but slight assistance, each case depending upon its own surrounding facts and circumstances. In every such case the all important question is what was the intention of the parties, and when that intention can be discovered that should control. In many of the cases cited which have held the lessee liable to rebuild, the courts may have been warranted in finding from the language used that such was the intention of the parties. From the instrument however, that we are now called upon to construe, we can discern no such intention. As was aptly said by Sherwood, J., in *Van Wormer v. Crane,* 51 Mich. 363, 369: 'The general obligation of the lessee to repair and his covenants to do so are not to be enlarged beyond their fair intent, and the tenant should not be held responsible for any damages in case of injury or destruction not anticipated, contemplated or intended when the lease was made, and the usual and commonly accepted meaning of the words used in the ordinary transactions of life should be given to the language used in the covenant.'

"We are of the opinion that the defendant herein is under no obligation to rebuild the destroyed building or to respond in damages for failure so to do."

The case of Saylor vs. Brooks, 114 Kan. 493, 220 Pac. 193, was one where the landlord, Brooks, leased the first floor and basement only of a building to the tenant, Saylor. The building, during the term of the leasehold, was destroyed by fire. The lease contained an agreement on the part of the landlord that the building was to be "kept in good repair". After the fire, Saylor insisted that Brooks rebuild the building and, upon his refusal, brought an action against him to recover damages. Defendant had judgment and plaintiff appealed. Affirming this judgment the court pointed out that "generally the agreement to repair is given the

same interpretation by whichever party made". It was also remarked that:

"The theory upon which an agreement to repair, or to keep in repair,. is held to include an obligation to replace in the event the property leased is destroyed, is like that under which the lessee's agreement to pay rent is held to bind him for such payment, even after the destruction of a building, the reasoning being that, if an exception on that account had been intended, the lease would have said so."

"The general rule" say the court "holding the tenant liable for rent after a building has been burned is limited to leases covering something more than the property destroyed". The court quoted in extenso from the strong opinion of Mr. Justice Brewer, in Whitaker vs. Hawley, supra, as follows:

"Again, in almost every other contract, these underlying facts are recognized, and modify the letter to accomplish the intent. Thus, in the hiring of chattels, though the terms be as absolute and positive as those of a real estate lease, their absolute. destruction without the fault of the hirer terminates the contract. It is assumed that the contract only lasts and the obligation to pay for the use continues only while the property remains in being, and not until the end of the term named in the contract. Anything which involves the substantial destruction of the chattel puts an end to the obligations of either party in reference to it. * * * So, if the hiring is of a room or rooms in a building, destruction of the building by fire puts an end to the lease. (Citing cases.)"

The court's conclusion regarding the case before it was thus stated:

"We do not think the fact that a lease covering a part of a building contains the statement that the landlord agrees to keep it in repair has any fair tendency to indicate that the parties actually contemplated an obligation on his part to rebuild in case the whole house should be destroyed, and we see no sufficient grounds

to interpret the language as imposing that duty upon him. The situation impresses us as one for the application of the principle under which the performance of a contract is excused, where, through no fault of the parties, its subject-matter, without which it cannot be executed, has ceased to exist."

In Heart of America Lbr. Co. vs. Belove, 111 Fed. 2nd. (C. C. A. 8th Cir.) 535, an appeal from a judgment for the defendant rendered in the western district of Missouri the conclusions of both the trial and appellate courts are thus stated:

"The court concluded that a lease containing provision that the landlord agreed to keep the property repaired would not indicate that the parties contemplated or intended an obligation on the part of the landlord to rebuild in case the whole structure were destroyed.

"We conclude that the lower court correctly construed the Kansas law as applied to the facts in this case, and the judgment appealed from is therefore affirmed."

In 32 Am. Jur. 405, § 494, the text reads:

"The rule that a lessee is not relieved of his obligation to pay rent through the accidental destruction of the buildings demised to him, which as heretofore stated, is applied by a majority of the courts, presupposes that some part of the premises remains in existence for occupation by the tenant, irrespective of the destruction. If the destruction of the premises is complete—nothing remaining, the subject matter or thing leased no longer existing—then the liability of the tenant for rent ceases."

The same text in the following section says that:

The rule that if the accidental destruction of the premises demised is so complete that the thing leased is completed obliterated, the liability of the lessee for rent ceases, is applied most frequently in the case of a lease of an apartment or of a single room. It appears to be universally held that the destruction of a building

terminates the lease of a room or apartment therein and with it the liability of the tenant for rents thereafter accruing."

So, 1 Tiffany's Landlord and Tenant 1196, § 182, upon the authority of many cases states that:

"In the case, on the other hand, of a lease of a building alone, without the land, or of merely certain rooms in or parts of a building, if the building, or the part thereof which is the subject of the lease, is destroyed, it has been generally held in this country that nothing remains from which the rent can issue, and that consequently the liability therefor immediately ceases."

It is interesting to note in this connection that in Williams vs. Bernath, 61 Ga. App. 350, 6 S. E. 2nd. 184, it was held that where the lease provided that the tenant would repair or keep in repair the leased property, which consisted of both real and personal property, and also that the tenant would deliver possession of this property in the same condition at the expiration of the lease as at the time of execution thereof, natural wear and tear excepted, the tenant's obligation under these covenants was subject to the implied condition that the property would be in existence at the end of the lease term and the tenant was not liable for property destroyed by fire during the existence of the lease.

In the case at bar the hired property, whose value is in controversy and sued for, was entirely personalty as hereinbefore indicated. That property was all destroyed. What was not destroyed was returned to the plaintiff. Hence, it seems to us that the rule should be in the instant case as announced by the Kansas Court in Saylor vs. Brooks, supra, and the two texts last above quoted.

But if that were not so we are not inclined to adopt for this jurisdiction a rule which the decisions reviewed above designate as placing a "strained" con-

struction upon the language in the covenants here involved and which is so, as it seems to us, extremely "harsh". We do not consider that the words in covenant "(b)" supra, "keep said property in good repair" in their ordinary use in our language should be invested with the hidden meaning of "insure said property" for the term of the lease or hiring. To do so would, we think, set a trap for our citizens engaged in business, not only for the careless or negligent only, but also, for those who are in the habit of relying in their business agreements upon the language used being taken to mean as usually interpreted. As well said by the Nebraska court in the Wattles case, supra, "the words 'repair' and 'keep in repair' are not technical words nor should they be given a technical or strained interpretation". A covenant to become an insurer of property, it is common knowledge, may frequently involve, as here, a heavy and extreme responsibility. The language used to impose that responsibility should be clear and not doubtful or capable of misconstruction.

We agree heartily with the Supreme Court of Hawaii in its remark quoted above that: "To the ordinary mind there would seem to be far more reason to construe an unqualified covenant to return an article in the same condition as it was when received as obligating the covenantor to in fact perform his covenant, than to construe a covenant to repair as an absolute covenant to rebuild". Yet, as we have seen, the weight of authority dealing with such a covenant is to the effect that the courts do not construe it so as to obligate a tenant to rebuild premises or property destroyed without his fault. Indeed, it would seem that such a covenant as "(a)" supra, really includes one to keep in good repair. Certainly if one agrees to return property in as good condition as he received it and it is injured while in his care it would seem rather difficult to properly assert that in performance of that agree-

ment the party so agreeing would not be required to "repair" or "keep in repair" the property affected. So we are completely in accord with Professor Williston when he says, (6 Williston on Contracts ( Rev. Ed.) 5521, 5522, § 1967), after stating that when a tenant has made a covenant in substance similar to covenant "(a)", supra, it means that "if the premises are destroyed without fault of the tenant he is not bound to restore them", he further says "If, for the first time, action had been brought in the sixteenth century on a covenant in this form, or in the latter part of the nineteenth century on a covenant in terms to repair, it may . be doubted whether any distinction would have been taken."

As we see it, the common law rule of construction of covenants to "repair" and "keep in repair" is not "applicable to the habits and condition of our society" or "its circumstances". It has been above noted in the concise language of Mr. Justice Brewer from what "circumstances" and state of society the rule just referred to arose. Society in this commonwealth, it is hardly necessary to observe, does not present the condition existing in England shortly subsequent to the overthrow of the feudal system. The landlord is not now as then preferred over the tenant. His rights are now no more sacred than those of his lessee. If there is any difference it would seem to be in favor of the tenant. In the time of Edward the Third there was no insurance of property provided for as we know it now. Our banking institutions and real estate agencies, in handling their own business affairs and the business affairs of others frequently employ agreements of lease and for the hire of property. They use in such agreements language with its ordinary meaning attached. We do not deem it wise, just, or fair, to announce our acquiescence in a rule of construction whereby, as stated in Phillips vs. Stevens, supra, people would be

surprised into contracts which neither party intended when the instrument was executed". We are not in sympathy with the concluding sentence of the opinion in that case written more than a century and a quarter ago that "the law must have its course and the citizens must take care of themselves in making their bargains". On the contrary, we think modern judicial thought is exemplified, to paraphrase an utterance familiar to Christendom for nearly 2,000 years, in the idea that the law "was made for man and not man for the" law.

We conclude, accordingly, that plaintiffs' alleged first cause of action cannot be maintained.

Relative to the plaintiffs' stated second cause of action which is grounded upon the alleged negligence of the defendant in failing to employ a watchman for the premises and property destroyed by the fire under the conditions averred to be there prevalent we regard the decisions now to be examined as materially of assistance in reaching a correct conclusion on the point. It would seem from our search as well as from the briefs of counsel before us that cases dealing with this question are somewhat limited in number.

In Bellows vs. Worcester Storage Co., 297 Mass. 188, 7 N. E. 2nd 588, the action was one of tort for alleged negligence causing the loss by fire of household furniture and household goods stored in defendant's warehouse, and the question to be resolved was whether there was any such negligence. It was established that there was no night watchman, no sprinkler system, and no burglar alarm. After saying that "a number of the circumstances relied on by the plaintiff as indicative of negligence would not warrant a finding of negligence", in the course of a review of these circumstances presented by the evidence the court states that "the ab-

sence of a night watchman and a burglar alarm does not seem to us to warrant a finding of negligence."

The case of Blackburn vs. Norris, et al., 46 Oh. App. 469, 189 N. E. 262, was one where it was charged that due to the negligence of the defendants relative to an automobile owned by plaintiff entrusted to defendants' care for repair work thereon the latter had failed and refused to return it. The defendants' answer was that while the car was in their possession, without any fault on their part, it was destroyed by accidental fire, entirely without negligence on their part.

The principal acts of negligence claimed by the plaintiff as outlined by the court in its opinion were "that the garage was constructed with a wood floor, that the defendants failed and neglected to have a night watchman, that paint was stored in the garage, and that certain doors of the garage were barred from the inside, and entrance could not be obtained except by forcing the doors". Judgment went for plaintiff. Reversing this and entering judgment for the defendant, after pointing out that "The facts in this case make this transaction a bailment for mutual benefit. It was based upon a sufficient consideration, and the bailee was required to use ordinary care for the safekeeping of the automobile", on the point in which we are now interested the court said, "As to the failure to maintain a night watchman, the evidence does not show that in a village of the size of Ripley it was customary or necessary for garage owners to maintain watchmen".

In Oktibbeha County Cotton Warehouse Co. vs. J. C. Page & Co., 151 Miss. 295, 117 So. 834, the plaintiff, Page & Co., brought an action to recover from the warehouse company the value of 53 bales of cotton which the former owned and which had been placed in the defendant's warehouse for storage. The defendant's answer stated that the cotton was wholly des-

troyed by fire without negligence on its part. It was urged for the plaintiff as showing negligence by the defendant in its care of the property thus lost that there was no watchman on guard at night and that the appellant depended upon the police officials of the city in which the warehouse was located for such protection. Plaintiff obtained the judgment of the lower court. This judgment was reversed on appeal and after referring to the fact that there were no circumstances in the record attempting to explain to the court how the fire originated and after quoting section 9557, Hemingway's 1927 Code (section 21 of chapter 218, Laws of 1920) which reads:

"A warehouseman shall be liable for any loss or injury to the goods caused by his failure to exercise such care in regard to them as a reasonably careful owner of similar goods would exercise, but he shall not be liable, in the absence of an agreement to the contrary, for any loss or injury to the goods which could not have been avoided by the exercise of such care,"

the court observed:

"We do not think the warehouse company in this case has failed to exercise that care of the cotton stored in its warehouse which the owner of the cotton would have exercised had it been in his possession. Would J. C. Page & Co. have employed a night watchman to watch 53 bales of cotton, while owning same, during the still hours of the night, at a time when the cotton was securely located in a building composed of brick walls, with a fireproof or metal roof, and no place of entrance, save at the doors, which were securely shut and locked, protecting that within from outside or extraneous things, and nothing to arouse any suspicion at the time of the close of the day's business that anything unusual was about to happen? * * * Common human experience teaches us that negligence may not be based on trifles, but must be based upon those things which should arouse the attention of a reasonably prudent person in the care of his own goods; and we have

reference to the character and degree of negligence described in the Warehouse Receipts Act".

It may be noted in passing that the Mississippi law above quoted is identical with our Section 121-214, W. R. S. 1931.

The case of Austin vs. Heath, 168 La. 605, 122 So. 865, was another case involving the destruction of some cotton, where the plaintiff sued for its value on account of its loss in defendant's warehouse by fire of unknown origin. It was charged as negligence on defendant's part that "he employed no watchman, and that he had no fire extinguishing apparatus, not even water barrels about the premises, although the town had no water system". Affirming a judgment for the defendant the court said:

"We do not think the defendant was obliged under the circumstances to hire a watchman; nor do we think that he was obliged to install a fire-extinguishing system in his warehouse merely because the town had none. But conceding that it might have been negligence on the defendant's part not to have water barrels handy to stop a small fire when first discovered, nevertheless we see no casual connection between such alleged negligence and the damage to plaintiff's cotton, for in this case the fire was discovered only after it had made such headway that there was no possibility of extinguishing it by means of pails of water thrown upon it.

"Moreover, defendant took as good care of the cotton stored for others as he did of his own; and since the actual conditions were well known to all who stored cotton with him, it follows that he took as good care of their cotton as they themselves expected him to take of it."

In Belt R. & Stockyard Co. vs. McClain, 58 Ind. App. 171, 106 N. E. 742, it appeared that the action was brought by McClain against the Stockyard Company to recover the value of a team of mules and a set of harness destroyed by fire in defendant's barns. Plain-

tiff was successful on the trial of the action. It was alleged on behalf of the plaintiff that defendant negligently locked the barn and negligently failed to have a watchman or any person in charge either in or about the building to give the alarm or rescue the property in case of fire.

Reversing the judgment in favor of the plaintiff and remanding the case for a new trial the appellate court discussed the charge of negligence in failing to have a watchman on the premises as outlined above thus:

"In order to show that this precaution was *negligently omitted,* it was necessary to prove not only that it was omitted, but also to show condition or circumstances which would justify the jury in finding that such precaution was reasonably required in the exercise of ordinary prudence, under the conditions and circumstances shown. It was the province of the jury to determine whether or not ordinary care required that a watchman should be kept constantly in and about the barn; but this is an ultimate fact which must be found as a result of inference from the conditions and circumstances proven at the trial, and unless the conditions and circumstances shown by the evidence are of such a character as that the ultimate fact may be rightfully and reasonably inferred therefrom, the finding of such ultimate fact is not sustained by evidence. A jury cannot be justified in finding that ordinary care required a certain act to be done or a certain precaution to be taken unless such an inference can be rightfully and reasonably drawn from the circumstances and conditions shown by the evidence. We are safe in saying that ordinary care does not require that a watchman be kept constantly in and about every building during the hours of darkness, for the purpose of protecting property against fire, thieves or other dangers. There is no room for reasonable minds to differ upon this question. * * * It was incumbent upon appellee to show some circumstances or conditions upon which the jury could base an inference that such a precaution was essential to the exercise of ordinary care. No such showing was made, and therefore there is no evidence

to support the finding of the inferential fact that ordinary care required appellant to keep a watchman in and about the building."

It would seem from the authorities examined as above set forth that on this phase of the case at bar whether the charge of negligence can be sustained must depend largely upon the circumstances proven. That is to say, in cases of this character the result in each case must, for the most part, be determined upon the particular facts presented therein. And that brings us to what the record in the case before us establishes relative to this question.

It will be recalled that plaintiff alleged that fire "broke out in the said premises about 3:00 o'cclock in the morning of March 10, 1943"; "that defendant negligently discontinued the keeping of a watchman or person in said premises all night". It seems to be conceded that under ordinary conditions in the night club, aforesaid, many people attended the place, that food was prepared for them during the night and morning hours, and that they were allowed to and did smoke while attending the club.

There is no evidence to which our attention has been directed as to when the fire started, what caused it, how soon its presence was detected, what action was then taken or by whom. There is no evidence regarding who turned in the alarm of fire. The acting Chief of the Casper fire department testified without dispute that the alarm was turned in to that department about 4:46 a. m; that it was not very long—probably 4 or 5 minutes—before he reached the scene of the fire; that the County fire apparatus which covers the rural district was there when he arrived; that there was no fire fighting equipment in Evansville, that he knew of; that when he arrived one hose line of water was being used against the fire, the water having just been turned on;

that the county equipment only was used; that it was 10 below zero; that two hose lines of water were used to extinguish the fire; that it would have been pretty hard to stop the fire then; and that one room of the building was saved. One of the firemen testified that the water lines just mentioned were attached to the Evansville fire hydrants.

The plaintiff testified that defendant said the latter's porter would serve as watchman; that defendant told him that he, Goe, "would keep a watchman there until he opened and after he opened the porter would serve as watchman because the porter would come before he would close the place and remain there and do the porter work until somebody else would come to the Club"; that after the fire plaintiff talked with defendant's son who was in charge of the place, the defendant himself being in Thermopolis at the time the fire occurred; that the son told the plaintiff "that business was quiet and he closed at 3 o'clock. The watchman wasn't there as he didn't get there until 4." One of the owners of the building testified that he had a conversation with the defendant prior to the latter's taking over the premises and that the conversation was "That there be a man there at all times and that the porter would come there before they close up and stay until the help came back the next afternoon."

The foregoing appears to be all the evidence in the record relative to the watchman so far as we are advised.

Does this evidence as the record now stands and under the authorities examined as above establish negligence on the part of Goe? We are inclined to think that it does not.

In Warren & Arthur Smadbeck Inc. vs. Heling Contracting Corp. supra, the United States Circuit Court of Appeals announced the rule that:

"To establish liability on the part of the appellant for fire loss, it was necessary for the appellee to prove some negligence which caused the fire. (Citing cases). Nor is there a presumption of negligence arising by reason of the fire. Accidental fires occur without negligence, and the occurrence of the fire does not justify the inference of negligence. In the absence of some explanation as to the origin of the fire and evidence tending to show that it was within the power of the appellant to have avoided its occurrence by the exercise of reasonable care, no presumption of negligence is raised so as to justify the imposition of liability."

For all that appears here the fire may have started and gained such headway that the porter who it seems was there at 4 o'clock in the morning could do nothing to extinguish it; indeed, the fire may have started after 4 o'clock in the morning and after the porter arrived. Its origin appears to be quite unknown so far as can now be told. True it is that the night club was closed an hour earlier than usual. It is not surprising that this was done when business was "light" at 3 a. m. due, evidently, to the out-of-doors temperature being extremely cold and 10 below zero at 4:50 a. m. Evidently few people were then present. Nothing unusual appears to have been observed at the closing hour to put anyone on guard. Was it absence of ordinary care for the proprietor to close the night club merely an hour earlier than usual under such conditions, nothing appearing to make it seem necessary to keep the place open an additional hour? We hardly think so, for we are not able to discern any evidence here which shows that it was within defendant's power to have avoided the occurrence of the fire by the exercise of such care. It may be that there is evidence which will throw light upon much that is now obscure. If so it should be forthcoming.

Upon the authorities and under the views we entertain relative to the record in this case, as above set

forth, we are constrained to reverse the judgment of the district court of Natrona County with instructions to grant a new trial, proceedings therein to be had not inconsistent with what has been said in this opinion.

Reversed with instructions to grant a new trial.

BLUME, Ch. J., and KIMBALL, J., concur.