TRUCK TERMINAL, INC., d/b/a Husky Chief

Terminal, Appellant (Defendant below),

v.

Paul NIELSEN, d/b/a Nielsen Trucking

Company, Appellee (Plaintiff below).

No. 2901

Supreme Court of Wyoming.

May 19, 1959.

339 Pac.2d 413

224

226

Henderson and Godfrey, Cheyenne, for appellant.

Walter C. Urbigkit, Jr., Cheyenne, for appellee.

Before BLUME, C. J., and PARKER and HARNS-BERGER, JJ.

228

OPINION.

Mr. Chief Justice BLUME delivered the opinion of the court.

This is an action by plaintiff, Paul Nielsen, doing business as Nielsen Trucking Company, appellee herein, against the defendant, Truck Terminal, Inc., doing business as Husky Chief Terminal, appellant herein, for damages to a truck under circumstances hereafter mentioned. The case was tried to a jury which returned a verdict in favor of the plaintiff. Judgment was rendered upon the verdict and the defendant has appealed. The parties will be named herein as plaintiff and defendant as in the court below.

The complaint in this case alleges as follows:

## I

For good and valuable consideration arising from past business and future prospect of business, defendant on March 5 and 6, 1957, undertook to store plaintiff's truck No. N70 by agreement with agents of plaintiff. Defendant failed to furnish proper storage and in fact removed the vehicle from heated storage during the night of March 5 to 6, 1957, and as a result the vehicle suffered damage from freezing resulting in the following direct and proximate damage to plaintiff:

| | | |
|---|---|---:|
| (a) | Cost of new turbo | $1,001.64 |
| (b) | Repairs in Cheyenne | 226.81 |
| (c) | Repairs in Salt Lake City | 75.00 |
| (d) | Driver breakdown time | 160.00 |
| (e) | Loss of use | 180.00 |
| (f) | Telephone calls incident to repair | 21.39 |
| | | $1,664.84 |

## II

On March 5, 1957, plaintiff's truck was delivered to defendant for storage in a heated garage. Defendant's

agents were advised that the vehicle contained water and not antifreeze. Sometime during the night of March 5 to 6, 1957, the vehicle was removed from the heated building and parked outside without the knowledge or consent of plaintiff or plaintiff's agents. Neither was the water drained from said vehicle nor other action taken by defendant or defendant's agents to prevent freezing. The vehicle was placed in storage by plaintiff's agents to prevent freezing, and in reliance upon the heated storage furnished by defendant, plaintiff's agents had not drained the water from the vehicle or taken other action to prevent freezing. As a result of the negligence, carelessness and misconduct of defendant and defendant's agents, the vehicle froze, proximately resulting in damage to plaintiff in the amount heretofore itemized in I above. Wherefore plaintiff demands judgment against defendant in the amount of $1,664.84 and costs of this action.

Defendant answered, denying each and every allegation contained in plaintiff's complaint. It alleged affirmatively that it is not and was not in the business of storing vehicles of any description in the month of March 1957; that it is solely in the business of selling petroleum products and servicing vehicles and has no facilities for storage; that plaintiff's truck No. N70 was never delivered to defendant nor accepted by defendant for storage or bailment; that a contract for storage or bailment was never executed between plaintiff and defendant; that the defendant never acquired a possessory interest sufficient for bailment nor received any consideration sufficient for a contract or bailment. Defendant asserts the following affirmative defenses:

(a) Assumption of Risk—The plaintiff as-

sumed the risk of any alleged damage that occurred.

(b) Contributory Negligence—The plaintiff was guilty of contributory negligence which contributed directly to any alleged damage.

(c) Estoppel—Plaintiff is estopped to recover because of its actions and representations upon which defendant relied.

(d) Fraud—Plaintiff's claim is based in fraud.

Defendant also filed a counterclaim but this was subsequently dismissed and need not be mentioned further. Counsel for defendant and appellant herein have made a statement of facts in their brief which we shall, with some additions, follow herein:

There is no dispute that plaintiff's diesel truck departed from Salt Lake City, Utah, on March 5, 1957, and proceeded across southern Wyoming on U. S. Highway 30. The drivers of the truck were George Bruhns, an employee of Nielsen Trucking Company, and Dean K. Christensen, an employee of Ringsby Truck Lines. The truck arrived in Cheyenne, Wyoming, sometime before midnight that evening after having proceeded through snow and cold weather all day. The truck was equipped with a sleeper cab so that one driver could sleep while the other driver operated the truck.

George Bruhns testified for the plaintiff that he arrived in Cheyenne about 9 or 10 p.m. on March 5, 1957. He stopped at the Husky Chief Terminal to purchase diesel fuel and have the truck serviced. The chains were repaired and the air breather was cleaned. He contacted the Wyoming Highway Department and

learned that the roads were closed. He discussed storage with Willoughby, an employee of defendant, and asked to leave his truck in a covered station. Willoughby stated that he would store the truck since no other trucks would be coming in during the night. Bruhns offered to pay for the storage but Willoughby said that it wasn't necessary. Bruhns then left for his sister's house in Cheyenne but before leaving defendant's station he expressly called attention to the fact that the truck did not have any antifreeze but only water. He returned the next morning and found that the turbo of the truck and the compressor were frozen. Temporary repairs were made in Cheyenne and other repairs were made in Salt Lake City, Utah.

Dean K. Christensen testified for the plaintiff that he arrived in Cheyenne, Wyoming, about 10 p.m. The diesel truck was placed in the grease pit at Husky Chief Terminal. The roads were closed out of Cheyenne. Willoughby agreed to store the truck. The truck turbo was frozen when he returned the next day. The supercharger was the damaged part and it was disconnected for the return trip to Salt Lake City. A load was taken back to Salt Lake City by the damaged truck. He was paid breakdown time while in Cheyenne.

Myron Holley testified for the plaintiff that he is a mechanic in Cheyenne, Wyoming. He performed temporary repairs on the plaintiff's truck in the sum of $226.81.

Paul W. Nielsen testified that he is the owner of the plaintiff company. The truck in question was hauling a load of sugar to Chicago, Illinois. He was unable to obtain a turbo-charger for the truck for two days. He

wanted to fly a turbo to Cheyenne but was unable to find one until two days later. He talked with Gus Fleischli over the phone on March 6, 1957, and Fleischli told him that everything would be taken care of.

Robert Willoughby testified for the defendant. He is presently a member of the Wyoming Highway Patrol. He was employed by Husky Chief Terminal on March 5, 1957. Plaintiff's truck pulled into the station about 9:30 p.m. The truck was placed in the grease pit to repair the tire chains. The driver of the truck said they were going downtown for a while. He refused to store the truck because other trucks would be coming in and out all night and he could not tie up a grease pit for storage. Grease pits are not designed for storage. There was no conversation about antifreeze in the truck radiator. The drivers did not tell him there was water in the truck. They had never stored trucks before and there were no facilities to store trucks at the station. Drivers sometimes store trucks at Land Air during storms. The snow during that night was light and trucks were passing through all night.

Kenneth Farrens testified for the defendant that he was assistant manager of Husky Chief Terminal on March 5, 1957. He was present when the plaintiff's drivers were talking to Willoughby. The drivers stated they were going to town for a while. There was no conversation about storing the truck in his presence and nothing was said about water in the radiator. Defendant never stored trucks because there were no facilities.

Gus Fleischli testified that he is the manager of Husky Chief Terminal. He tried to help the plaintiff

obtain repairs for the truck. Plaintiff was a fair customer. There were no facilities for storing trucks at Husky Chief Terminal. The average truck remains on the grease pit about 30 minutes to an hour as there are often about 26 grease jobs a day.

A few additional facts will be mentioned hereafter.

1. Counsel for defendant contend that the court submitted the case to the jury upon a wrong theory. They mean that the court assumed that there was in fact a bailment when that fact was actually in dispute. The court instructed the jury by Instruction No. 5 as follows:

> "The Court instructs you that a 'bailment' may be defined as a delivery of personalty for some particular purpose, or on mere deposit, under a contract, express or implied, that after the purpose has been fulfilled it shall be redelivered to the person who delivered it, or otherwise dealt with according to his directions, or kept until he reclaims it, as the case may be."

There is no particular fault to find with that instruction. The defendant offered an instruction to the following effect:

> "You are instructed that a bailment may not be forced upon a party and it is based upon contractual principles. In other words, there must be an offer by one party, for a sufficient consideration, to do a particular thing, and there must be an acceptance by the other party. Before there can be a contract between two parties, the minds of the two parties must come together upon all the terms and conditions of the contract, or, as it is sometimes said, the minds of the contracting parties must meet."

The offered instruction is not entirely correct. It states that there must be a consideration. In 8 C.J.S. Bailments § 16, p. 250, it is said that "The bailment of personal property needs no consideration other than the transaction itself to support it." But the offered instruction was correct insofar as stating that a bailment may not be forced upon a party and that there must be an acceptance on the part of the bailee, or of the person who is to be a bailee, and that the minds of the parties must meet. In Annotation, 1 A.L.R. 394, 397, 398, it is stated:

"In order to establish a bailment, there must be an acceptance of the article bailed, it being necessary to show either an express contract to take the article and later redeliver it, or circumstances from which such a contract can be implied, it being sufficient to prove acceptance either directly or by circumstances showing a constructive acceptance. In other words, since the relation is founded upon contract, either express or implied, the duty and liability springing therefrom ordinarily cannot be thrust upon one without his knowledge or consent, but must be voluntarily assumed by the party himself or some authorized agent. And no legal responsibility rests on one who declines to become a bailee * * *."

The court might well have embodied this principle in its instruction in view of the contentions of the defendant herein. However, we do not think that this was fatal. The court instructed the jury as follows:

"The issues of this case in brief are:

"The plaintiff contends that he, by his truck driver agents, left the truck in question at the defendant's station under a bailment with the consent and agreement of defendant's employees, the truck to remain there overnight; that plaintiff's

employees told defendant's employees that the truck had no antifreeze and must be kept in a warm place to protect it from damage by freezing; that the defendant wrongfully and negligently placed the truck outside, as a result of which the turbo-charger and air compressor were frozen and had to be replaced, and that plaintiff suffered damages as follows:

| | | |
|---|---|---|
| a) | Cost of new turbo | $1,001.64 |
| b) | Repairs in Cheyenne | 226.81 |
| c) | Repairs in Salt Lake City | 75.00 |
| d) | Driver breakdown time | 160.00 |
| e) | Loss of use | 180.00 |
| f) | Telephone calls incident to repair | 21.39 |
| | | $1,664.84 |

and that he is entitled to recover that amount from defendant.

"The defendant, on the contrary, contends that plaintiff's truck was left at defendant's station to have the tire chains repaired; that storage for the night was refused; that nothing was said as to the lack of antifreeze in the truck, and that the plaintiff's drivers left to be gone for a short time and did not return until morning; that there was no bailment or agreement for storage and defendant is not responsible for any damage which may have occurred to the truck."

In the next instruction the court instructed the jury that the burden of proof was on the plaintiff. Thus the contentions of the parties were set forth very clearly and, if the contentions of the plaintiff were true, as the jury found, there was clearly a bailment. Since the court instructed the jury that the burden of proof of his contentions was on the plaintiff, the question as to whether or not there was a bailment was left to the jury and was not assumed by the court to exist as counsel contend.

238

2. Defendant asked for an instruction as follows:

"You are instructed that it is the duty of the bailor to reveal any hidden characteristics or characteristics that cannot be ascertained upon reasonable examination of the bailed article to the bailee and the bailee is not responsible for any damage that may occur as a result of hidden or unascertained characteristics."

In the first place, we are not at all certain that the absence of antifreeze in the truck was a hidden characteristic. That fact could have been easily ascertained by a cursory examination. In the second place, the matter was directly in issue. The evidence for the plaintiff showed that special attention was called to the want of antifreeze in the truck. The testimony in favor of the defendant showed the contrary. The matter was for the jury to determine and the refusal to give the instruction asked was not, we think, prejudicial.

3. Counsel offered an instruction on estoppel. We fail to find any elements of estoppel in this case. Counsel state in their brief that "there was ample evidence of misrepresentation and reliance." We do not know what counsel mean. We find no misrepresentations in the record unless counsel mean that the testimony of the witnesses for plaintiff was false, but that was a matter for the jury to determine, and they determined evidently that no misrepresentations were made.

4. Counsel for defendant also asked that an instruction on assumption of risk be given. We do not suppose that counsel refer to the well-known doctrine of assumption of risk which is only applicable in cases arising between master and servant. 4 Words and

Phrases, Assumption of Risk, pp. 607, 612. It is that rule which is doubtless intended to be referred to in Rule 8(c) of our Wyoming Rules of Civil Procedure when it refers to "assumption of risk". We presume that counsel refer to a more general and wider sense of assumption of risk. For instance, when a man in freezing weather leaves a warm house and goes outside he runs—assumes—the risk of getting cold. If the agents of plaintiff had deliberately left the truck in question standing outside of any shelter in freezing weather, they would have run—assumed—the risk of freezing parts of the truck. But there was no need of a special instruction on this subject. The matter was involved in the question as to whether or not there was a bailment and whether or not the defendant exercised the care necessary under the circumstances. The matter was resolved in favor of the plaintiff. There is no merit in the contention that the verdict was not sustained by sufficient evidence. We held in Willis v. Willis, 48 Wyo. 403, 49 P.2d 670, 678, Id., 49 Wyo. 296, 54 P.2d 814, and in many cases decided since then, that the appellate court must assume that the evidence in favor of the successful party is true, leaving out of consideration entirely the evidence of the unsuccessful party in conflict therewith, and give to the evidence of the successful party every favorable inference which may be reasonably and fairly drawn from it.

5. The court refused to permit the witness Fleischli to testify that it was his custom not to store any trucks at his filling station. This is assigned as error. Counsel for defendant have not cited us to any case holding that the holding of the court was error. The point is not clear. It is said in 31 C.J.S. Evidence § 180, p. 881:

"* * * the custom of a party or his employees, or the course of conducting his business, may become

relevant and material in an action involving some
claim or liability arising out of such business; and
evidence of a habit of doing a thing in the course
of business is, if clearly shown as a definite course
of action, admissible as indicating that, on a par-
ticular occasion, the thing was done as usual."

So perhaps the custom sought to be shown would indi-
cate that defendant in this particular case did what
was usually done and would corroborate Willoughby's
testimony. The witness Willoughby testified in part
as follows:

"Q. During the time you worked for Husky
Terminal did you ever store trucks for Nielsen be-
fore? A. No, sir.

"Q. Did you ever store trucks? A. No, we never
did because we didn't have facilities. If someone
wanted a truck stored, we would call Land Air or
somebody [who] had facilities for storing trucks."

The witness Farrens testified in part as follows:

"Q. In your experience as assistant general
manager out there have you ever stored Nielsen's
truck? A. No, I wouldn't store anybody's truck.

"Q. What is the reason for that? A. Because
we run twenty-four hour service and we done only
service work, they didn't have storage facilities."

The witness Gus Fleischli testified without objection
that he had no facilities for storing trucks at his sta-
tion.

We are inclined to believe that the testimony of these
witnesses substantially conveyed to the jury the idea
contained in the fact that the custom of the defendant

was not to store any trucks, and if the excluded evidence was error we do not think the error is sufficiently prejudicial to warrant a reversal of the judgment herein.

6. Damages. The turbo and the compressor were frozen. Two days were lost before the truck was able to move again, and then instead of proceeding to Chicago as had been contemplated, it was returned to Salt Lake City in order that a new turbo might be installed. A new turbo was necessary to be acquired. Repairs had to be made. The men had to be paid for time lost and the profits from the trip to Chicago were lost. The items are set out in plaintiff's complaint. At the pretrial conference, it was agreed that the cost of the new turbo was reasonable and that the charges for repairs at Cheyenne and Salt Lake City were reasonable. Counsel for the defendant, however, contend that at least some of the damages should have been mitigated, and we understand them to contend that the burden in connection with that was upon the plaintiff. However, they are mistaken in that connection. It is stated in 25 C.J.S. Damages § 144e, p. 791, as follows:

"The party who commits a wrong has the burden of establishing matters asserted by him in mitigation or reduction of the amount of damages. So the burden is on him to show that some of the consequences of the injury might have been avoided by proper efforts or acts of the injured party * * *."

The cost of the new turbo could not have been minimized nor that of the compressor. The repair of the latter was the main charge made at Cheyenne, namely, in the amount of $134.86. It was necessary to repair the compressor because it furnished the air for the

brakes. But the remainder of that item and the cost of the repairs at Salt Lake City, the loss of time for the men and the loss of profits could have been minimized to some extent at least if a new turbo had been available sooner. It was not obtained until several days after the breakdown at Cheyenne. Counsel for defendant claim that they were not permitted to cross-examine the witness Holley as to being able to obtain a turbo in Denver. The witness was asked, "Could you have obtained a turbocharger in Denver?" The court sustained an objection made by counsel for the plaintiff. We think the ruling was erroneous. However, counsel for defendant made no offer to show what the witness would testify so they cannot complain of the ruling. Moreover, at a previous question, the same witness was asked, "Q. Could you usually buy a turbo of this type in Denver? A. Yes." The plaintiff Nielsen in this case testified that he made every effort to obtain a turbo as soon as possible and that it had been his intention to fly a new turbo to Cheyenne if it could be obtained, but he was not able to obtain one at that time. The defendant made no effort to show that a turbo was obtainable in Denver at that time and previous to the time that one was obtained in Salt Lake City. Since the burden to show that the damages might be mitigated was upon the defendant and he made no effort in connection with the matter already mentioned, there is no reason why the testimony of the plaintiff Nielsen should not be accepted by this court.

The plaintiff was employed by the Ringsby System to haul its goods and received as compensation the sum of sixteen cents per mile, the Ringsby System paying the drivers in addition. On the occasion in question here, plaintiff was able to haul the goods only from Salt Lake City to Cheyenne, Wyoming, a distance of

471 miles, making the total received for the round trip $150.72. The drivers were laid off two days on account of the damages to the truck of plaintiff. Their compensation for breakdown time was $1.15 an hour, and inasmuch as they were paid by the Ringsby System, the amount due to them was deducted from the payment which the plaintiff received for the haul to Cheyenne. The plaintiff, of course, had personal knowledge of the facts except, perhaps, as to the exact amounts of money involved. In that connection, counsel for plaintiff attempted to introduce a letter dated April 4, 1957, from the Ringsby System. An objection was made to the letter as being hearsay evidence, which it was. The record is not very clear as to whether or not it was actually introduced in evidence. However, it appears from the record that in the main the letter was used merely for refreshing the testimony of the witness Nielsen. He was asked, "From your own recollection and refreshing your recollection from this description [in the letter] you received, * * * what was your gross from, that was paid to you by Ringsby for the trip from Salt Lake to Cheyenne and back to Salt Lake?" He stated that he received $150.72 at the rate of sixteen cents per mile but the deductions for breakdown time for George Bruhns and Dean Christensen were made in the sums of $66.70 and $80.50. On the whole, we see no prejudice resulting from the recollection of the witness being refreshed from the letter in question. He also testified that if he had been permitted to make the trip to Chicago he would have made a net profit of six cents per mile which, for the round trip from Salt Lake City to Chicago of three thousand miles, would be $180.00. Counsel for the defendant argue that the books of the plaintiff should have been introduced to show this profit, but we see no particular

reason why the independent knowledge of the witness could not be accepted as evidence.

The witness Nielsen also testified as to the telephone bill mentioned in the complaint consisting of the sum of $21.39. The witness testified that he received four calls from George Bruhns, his driver, and that the charges were in the sum of $21.39. Counsel object that that was not the best evidence and that the receipts for these telephone calls should have been introduced in evidence. However, we think that while the witness did not directly testify that he paid these charges, that is substantially the effect. It is stated in 32 C.J.S. Evidence § 802, p. 729:

> "The payment of money * * * may be proved by parol without accounting for the absence of a receipt evidencing such fact, where the witness can testify to the fact positively and from his own independent knowledge, not founded on his having seen the receipt * * *. While bills representing payments by a person have been held admissible, receipts have sometimes been held inadmissible as being inferior to the testimony of living witnesses. * * *"

We think that the objection in this connection must be overruled.

We have examined the record before us with considerable care and we do not find any error sufficient to justify the reversal of the judgment in this case and it is, accordingly, affirmed.

Affirmed.