PANHANDLE EASTERN PIPE LINE COMPANY, a Delaware Corporation authorized to do business in the State of Wyoming, Appellant (Defendant),

v.

Nowlin SMITH, Jr., Appellee (Plaintiff).

No. 5506.

Supreme Court of Wyoming.

Dec. 16, 1981.

Richard L. Williams of Williams, Porter, Day & Neville, P. C., Casper, for appellant.

Bernard Q. Phelan of Graves, Hacker & Phelan, P. C., Cheyenne, for appellee.

Before ROSE, C. J., and RAPER, THOMAS, ROONEY and BROWN, JJ.

BROWN, Justice.

Panhandle Eastern Pipe Line Company (Panhandle) appeals a district court judgment granting damages to its former employee Nowlin Smith, Jr., for breach of contract. Panhandle asserts that no contract ever existed. It maintains that the dispute which is here on appeal should have been submitted to arbitration under the terms of a collective bargaining agreement. It also maintains that if this court decides a contract did exist, we should nevertheless reverse the damage award because it was not supported by sufficient evidence.

We affirm.

Panhandle fired Mr. Smith in October, 1979. Mr. Smith followed the grievance procedure provided by a collective bargaining agreement to the third and final level of intracompany proceedings, which was a meeting with company officials at the division office. After that meeting, Panhandle initially decided to uphold the decision to fire Mr. Smith, but changed its mind after Mr. Smith's union representative requested that it reconsider. By letter dated December 13, 1979, the company offered to withdraw the discharge if Mr. Smith would agree to comply with certain terms and conditions. Mr. Smith signed the letter under the typewritten words, "Understood, Agreed To and Accepted," added some handwritten notations, and again signed his name. The union representative also signed the letter and returned it to the company.

Because Mr. Smith wrote on the letter, Panhandle argues that no contract existed, claiming that Mr. Smith failed to use the mode of acceptance which it prescribed. As Panhandle conceded at oral argument, it would have contested any words being added to the letter, even ones as innocuous as, "Have a nice day." Panhandle also argues that Mr. Smith made a counteroffer by adding terms and conditions which showed he was trying to modify the offer.

We think appellant's "mode of acceptance" argument was not directly raised in the district court. Panhandle's pleadings spoke to a counteroffer being made because Mr. Smith added terms and conditions to the proposed offer. The exhibits introduced at trial spoke to "modifications," and "added terms and conditions," implying that the content of the words mattered. No mention was made anywhere below of

"mode of acceptance" or "method of acceptance." Appellant cautioned this court not to confuse the two theories of "mode of acceptance" and "counteroffer," although appellant tried to interweave them in its brief. Because we want to avoid any confusion, we have decided to address both the "mode of acceptance" argument and the "counteroffer" argument.

## I

 An offeror has the right to demand an exclusive mode of acceptance from an offeree. The mode of acceptance can be unreasonable or difficult if the offeror clearly expresses his intention to exclude all other modes of acceptance. This intention must be expressed in the communicated offer itself. *Crockett v. Lowther*, Wyo., 549 P.2d 303, 309 (1976), citing 1 Corbin, Contracts, § 88, at 373 (1963). The letter of December 13, 1979, contained the offer to withdraw Mr. Smith's discharge. The letter directed that both Mr. Smith and the union had to agree in writing to the terms of the offer, and that the signatures were a condition precedent to the withdrawal of the discharge.[1] It went on to reiterate that the withdrawal of the discharge was contingent upon receipt of written acceptance by Mr. Smith and the union.

 Panhandle insists that it modified this offer by demanding of Mr. Smith during a telephone conversation that he just sign the letter and not add anything. Mr. Smith, however, does not remember the conversation that way, and we must view the evidence on appeal most favorably to him. *Madrid v. Norton*, Wyo., 596 P.2d 1108 (1979). Here, Mr. Smith testified he did not understand that any addition to the letter would be considered a rejection of the offer. Panhandle, therefore, did not orally modify the written offer of December 13, 1979; it failed to "clearly express, in the terms of the communicated offer itself," its intention to exclude all other modes of acceptance. *Crockett v. Lowther*, supra. Panhandle was explicit only in stating that the terms and conditions had to be agreed to in writing.

The offeror is master of the offer, but we think fairness demands that when there is a dispute concerning mode of acceptance, the offer itself must clearly and definitely express an exclusive mode of acceptance. There must be no question that the offeror would accept the prescribed mode and only the prescribed mode. Corbin comments, "The more unreasonable the method appears, the less likely it will be that a court will interpret his offer as requiring it [a specific mode of performance] and the more clear and definite must be the expression of his intention in words." 1 Corbin on Contracts, § 88, at 373 (1963). The only motivation we could surmise for the requirement that no handwriting be added to the paper, regardless of content, would be that the offeror had an inordinate fondness for tidy sheets of paper. The requirement strikes us as unreasonable, and strikes out as a prescribed mode of acceptance unless the offeror's intention is explicitly set out. We agree that the mode of acceptance rule " * * * has been enforced with a rigor worthy of a better cause." Calamari & Perillo, Contracts, § 2–22 (2d ed., 1977). We are not eager to enforce it if there is any question about the mode of acceptance or about the clarity with which the demand was made. Had Panhandle seriously been proposing an exclusive mode of acceptance calling for the absence of any writing on the paper other than signatures, the letter should have explicitly demanded that exact and exclusive mode of performance.

## II

 The requirement that no terms or conditions be added to change the contract

---

1. " * * * The Company has, therefore, determined that Mr. Smith will be given one more opportunity to rehabilitate himself and his discharge shall hereby be withdrawn under the terms and conditions listed below, which terms and conditions must be agreed to in writing by both Mr. Smith and the Union as a condition precedent to the withdrawal of the discharge."
The letter then said, "The terms and conditions are: * * * " and set out eight additional terms and conditions, some of which will be discussed later.

is a different matter. The law of contract formation dictates that one who modifies an offer has usually rejected the offer and made a counteroffer, and that no contract exists unless the original offeror accepts the counteroffer. *Trautwein v. Leavey*, Wyo., 472 P.2d 776 (1970). Panhandle contends that Mr. Smith made a counteroffer by adding a request on the letter to see his personnel file and to contest any mistakes he found there. An offer must be accepted unconditionally; but there is, as always, an exception to the rule. An acceptance is still effective if the addition only asks for something that would be implied from the offer and is therefore immaterial. 1 Corbin on Contracts, § 86, p. 368 (1963). *Kodiak Island Borough v. Large, Alaska*, 622 P.2d 440 (1981); *Pickett v. Miller*, N.M., 412 P.2d 400 (1966). A Panhandle supervisor, Mr. Smith, and a company machinist, who was also a union representative, all testified that all Panhandle employees had the right to see their personnel files. Panhandle's offer to withdraw its discharge and eventually reinstate Mr. Smith carried with it the implication that he would be able to see his personnel record when he was once again an active employee.

Besides reserving the right to see his personnel file, Mr. Smith wrote that his personnel file contained mistakes, and that he was having financial problems, apparently as a result of the company's actions. Williston has described the kind of acceptance Mr. Smith made as one showing "an abundance of caution," and Corbin has called it a "grumbling acceptance," which in this case it certainly appeared to be.[2] The acceptance was unenthusiastic to be sure, but it was an acceptance nevertheless. Mr. Smith signed his name under the words "Understood, Agreed To and Accepted." He wrote that he agreed to the terms and conditions. He began performance by seeking medical help and by sending in a check to keep his insurance current. Mr. Smith wanted to be sure that he would be able to see his personnel file when he returned to work. His effort to insure that right should not block him from benefits that Panhandle had already offered to him. His "grumbling acceptance" should stand.

Mr. Smith found himself in his own "Catch-22"[3] when he tried to accept Panhandle's offer contained in the letter of December 13, 1979. The letter said that Mr. Smith could contact Panhandle's supervisors about the terms and conditions of the offer.[4] When Mr. Smith telephoned the company to ask about his personnel files, Panhandle viewed his request as an indication that Mr. Smith did not want to eliminate the problems that had led to his discharge. In the same letter, Panhandle wrote that Mr. Smith would have at least six months to improve his emotional state, and indeed demanded that Mr. Smith receive counseling for that purpose.[5] When Mr. Smith made a request which Panhandle thought showed an improper attitude, he

---

2. 1 Williston on Contracts, § 78 (3rd ed., 1962); 1 Corbin on Contracts, § 84 (1963).

3. In the novel *Catch-22*, Group Headquarters let its men request a medical release if they thought they were on the verge of a nervous collapse. When Yossarian, a bombardier, asked the doctor for a release, the doctor refused. He told Yossarian the catch was that his recommendation for a release had to be approved by Group, and Group never approved any of them. The doctor later said to Yossarian that Group couldn't let the crazy people go home, as no one else but a crazy person would fly the bombing missions willingly. J. Heller, *Catch-22*, Simon and Schuster (1955, 1961).

4. "7. Without limiting Mr. Smith's ability to contact Company Supervisors to ask questions about these terms and conditions or other business related matters * * * the Company expects that there will be no unusual contacts by Mr. Smith with Company employees or Supervisors which might reasonably leave an impression of threatening, intimidation or harrassment [sic]."

5. "2. Within two weeks of acceptance hereof, Mr. Smith must have contacted his choice of a psychiatrist, psychologist, or other licensed individual * * * capable of giving him complete treatment for his emotional disorder and he must have established a schedule and frequency of treatment which, in the opinion of the Doctor, might reasonably be expected to enable him to overcome his problem within the leave of absence period * * *."
The leave of absence period was six months.

was apparently fired because he had failed to spontaneously rehabilitate. We do not dispute that Panhandle's offer to Mr. Smith was generous. We do say that Panhandle could not withdraw its offer just because Mr. Smith did not and could not fulfill Panhandle's unrealistic and contradictory expectations.

### III

Panhandle contends that Mr. Smith should not be allowed to assert his claim for breach of contract because the collective bargaining agreement under which he was employed required him to take his grievance to arbitration. The agreement did provide a three-step grievance procedure culminating in the fourth step of binding arbitration. The arbitration clause of the collective bargaining agreement said "All grievances and disputes arising under the terms of this Agreement * * * shall be settled in accordance with this Article." The courts are to decide the question of whether a grievance or dispute arises under the terms of the bargaining agreement and should be arbitrated, unless the agreement clearly demonstrates that the question is reserved to the arbitrator. *United Steelworkers of America v. Warrior and Gulf Navigation Company*, 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960). Although this court has said that arbitration is favored, it is a matter of contract, and a party cannot be required to submit any dispute to arbitration which he has not agreed to submit. *American National Bank of Denver v. Cheyenne Housing Authority*, Wyo., 562 P.2d 1017 (1977).

We think that neither party here agreed to submit this dispute to arbitration. Mr. Smith took his original grievance about his termination of employment through the three-step grievance procedure, which resulted in a decision to uphold the company. The company then chose to offer Mr. Smith a contract independent of the grievance proceedings. The record shows that the company itself considered the offer of De-

cember 13, 1979, to be an independent one. The offer set up terms and conditions with which Mr. Smith had to comply, while Panhandle tried to reserve the right to reinstate Mr. Smith's original discharge at its sole discretion if Mr. Smith violated any of the separate terms and conditions.[6] The dispute which arose over the offer of December 13, 1979, was not a dispute arising under the terms of the collective bargaining agreement. Before the company made its offer to Mr. Smith on December 13, 1979, he would have been required to submit the matter to binding arbitration. The arbitrator would have considered the same matters that had been considered at the grievance proceedings. After Panhandle made the offer to Mr. Smith, he would have been submitting a different issue to the arbitrator, the issue of whether a new contract existed and was breached.

Furthermore, Panhandle had the burden of proving that the dispute should have been arbitrated, since that burden is on the party asserting it. If Panhandle wanted the dispute to be arbitrated, it should have used the procedure set out in the Uniform Arbitration Act, § 1–36–101, et seq., W.S. 1977, which says that the district court has the jurisdiction to enforce an agreement providing for arbitration. *American National Bank of Denver v. Cheyenne Housing Authority*, supra at 1020. When a party makes application to arbitrate and shows an agreement to arbitrate, the court must order the parties to proceed with arbitration. If any action involving an issue subject to arbitration is pending, the district court will then stay the action.

Even had this dispute been subject to arbitration, there are certain instances where a party asserting arbitration is estopped by his own conduct to rely on unexhausted arbitration procedures. *Vaca v. Sipes*, 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967). The right to have a dispute submitted to arbitration is a contractual right which may be waived either

---

6. "8. Violation of any of the above terms and conditions may, in the sole discretion of the Company, result in the reinstatement of Mr. Smith's discharge. * * *"

expressly or implicitly. *Spain v. Houston Oilers*, Tex.Civ.App., 593 S.W.2d 746 (1979); *Barton-Dixie Corporation v. Timothy McCarthy Construction Co.*, 436 F.2d 405 (5th Cir., 1971). We think Panhandle waived any right it may have had to arbitration. Panhandle implied that it considered its offer to be separate from the terms of the collective bargaining agreement, and then denied that any contract even existed. It also failed to use the statutory procedure for requiring arbitration, and having failed to do so, it should not be able to raise the issue now. Therefore, even had the dispute been one which arose under the terms of the bargaining agreement, Panhandle waived its right to assert arbitration.

IV

Appellant contends that there was insufficient evidence to support the trial court's finding of damages of $40,000. We do not agree.

The measure of damages for breach of contract is that which would place plaintiff in the same position as he would have been had the contract been performed, less proper deductions. *Reynolds v. Tice*, Wyo., 595 P.2d 1318 (1979); and *Zitterkopf v. Roussalis*, Wyo., 546 P.2d 436 (1976). In a suit for breach of an employment contract, then, the damages are the amount of compensation agreed upon for the remainder of the period involved less the amount which the employee earned or with reasonable diligence could have earned from other employment.

The contract which Panhandle offered to Mr. Smith was for an indefinite term, and impliedly called for reinstatement of Mr. Smith's discharge only if Mr. Smith violated any of the terms of the contract. Mr. Smith testified that he had worked for Panhandle for eight and one-half years and had intended to stay with Panhandle until retirement at age fifty-five, which would have been twenty-six more years. There was also testimony showing twelve years to be the average seniority at the company. The trial judge here determined that it

would be reasonable to infer that a person who had already worked eight years for a company, enjoyed favorable working conditions and benefits, and intended to stay until retirement, would be employed for a longer period than the average period of seniority. He decided that a figure of eight years of continued employment would be reasonable. Appellant argues that the twelve-year seniority figure is not applicable because it is not the same as the average time an employee stayed with the company. Be that as it may, the figure is still a useful one because it provides the average length of time that people who are currently employed at Panhandle have been on the job. Mr. Smith was a member of that group until his termination. The judge could also give weight to Mr. Smith's testimony that he intended to stay at Panhandle until retirement. Appellant offered no objection or contradictory testimony, and we think that the eight-year figure was reasonable in light of the evidence.

The trial judge also decided that Mr. Smith's damages were $5,000 a year for the eight years. The value of the tangible lost fringe benefits of a stock purchase plan, health insurance, investment credit matching stock ownership plan, group life insurance, and a qualified retirement pension plan were mathematically ascertainable according to the testimony of one of Panhandle's own supervisors at one-half of the hourly wage, which in Mr. Smith's case was one-half of $8.35 an hour for a total of approximately $12.52 an hour. That does not take into account any monetary value the judge attributed to the less mathematically ascertainable benefits of which Mr. Smith was deprived as a result of the contract breach. The trial judge said:

"* * * I don't think there is any doubt that Mr. Smith has a much poorer job today than he would have with Panhandle Eastern. He doesn't have the benefits, doesn't have as good working conditions, his work is hit and miss, and there are not hours or days guaranteed. I don't think it a bit speculative to place a value on those benefits over and above

anything that Mr. Smith is making today of $5,000 a year."

The fact that some of the lost benefits of Mr. Smith's job at Panhandle may be characterized as intangible does not mean that Mr. Smith should not be able to recover for their loss. It is true that one meaning of intangible is that which cannot be defined with precision (Webster's Third International Dictionary Unabridged, p. 1173, G. & C. Merriam Co. 1966). Semantics aside, however, Mr. Smith testified that he does not get to work a forty-hour week, that he is no longer under a union contract, that his work is harder physically, and that it is less comfortable because he is working outdoors. Neither appellee nor an expert witness could place an exact dollar value on the loss of those benefits. Whether we call the loss of those benefits tangible but not mathematically ascertainable with precision or whether we call them intangible, they are injuries caused by Panhandle's breach of contract for which Mr. Smith should be recompensed.

The existence of those damages here is as tangible as the existence of pain and suffering damages in a personal injury case or the existence of damages to character and reputation in a defamation case. The United States Supreme Court said in a tort case that there is a clear distinction between the measure of proof necessary to prove that the plaintiff has sustained some damage and the measure of proof necessary to allow the factfinder to fix the amount of damages. *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 51 S.Ct. 248, 75 L.Ed. 544 (1931). Although there was some doubt at that time whether the same rule applied to contract cases, the Supreme Court later said in a case in a bankruptcy proceeding involving a lessor's claim for damages for rejection of its lease, citing to *Story Parchment Co. v. Paterson Parchment Paper Co.*, supra, that certainty in the *fact* of damages is essential, but that certainty as to the amount goes no further than to require a basis for a reasoned con-

clusion. *Palmer v. Connecticut Ry. & Lighting Co.*, 311 U.S. 544, 61 S.Ct. 379, 85 L.Ed. 336 (1941).[7]

 The existence of damages must be proved; the amount of damages must be decided with all the certainty the case permits. That is what happened here. The amount of damages in this case cannot be determined with precise mathematical exactness, but it does not have to be:

"* * * Although a factfinder may not make an award on the basis of speculation or conjecture, he need not make an award with precise mathematical exactness. It is sufficient if he determines *the amount* with a reasonable degree of certainty on the basis of the evidence placed before him, if the evidence is such as is reasonably applicable to the nature of the injury." (Emphasis added.) *Sagebrush Development Inc. v. Moehrke*, Wyo., 604 P.2d 198, 202 (1979).

The evidence presented at trial was reasonably applicable to the nature of Mr. Smith's injury. It went to the fact that he does not have as good a job now as he did at Panhandle. According to Corbin:

"There are many cases in which, by reason of the ordinary experience and belief of mankind, the trial court is convinced that substantial pecuniary harm has been inflicted, even though its amount in dollars is incapable of proof. If the defendant had reason to foresee this kind of harm and the difficulty of proving its amount, the injured party will not be denied a remedy in damages because of the lack of certainty. * * *" 5 Corbin on Contracts, § 1020, pp. 125–126 (1964).

This is one of those cases. It is also one of those cases where "substantial justice is better than exact injustice." *Weinglass v. Gibson*, 204 Pa. 203, 155 A. 439, 440 (1931).

Appellant argues that Mr. Smith was free to choose any other job he wanted and that he could have found a better job than he did. Mr. Smith did have to exercise reasonable care and diligence to avoid loss or

---

**7.** For a recent case speaking to this rule, see *American Sanitary Sales v. Purchase & Prop.* *Div.*, 178 N.J.Super.A.D. 429, 429 A.2d 403 (1981).

lessen the resulting damage, but the question as to whether he used reasonable care and diligence is one for the trier of fact, within its considerable discretion. *Wyoming Bancorporation v. Bonham*, Wyo., 563 P.2d 1382 (1977), reh. denied, Wyo., 566 P.2d 219 (1977); *Asbell Bros., Inc., v. Nash-Davis Machinery Company*, Wyo., 382 P.2d 57 (1963); and *Thayer v. Smith*, Wyo., 380 P.2d 852 (1963). We are not prepared to disagree with the trier of fact on the question of Mr. Smith's mitigation. Panhandle, as the party breaching the contract, carried the burden of proving that Mr. Smith did not mitigate his damages. *Sturgeon v. Phifer*, Wyo., 390 P.2d 727 (1964); and *Truck Terminal, Inc., v. Nielsen*, Wyo., 339 P.2d 413 (1959). Panhandle failed to prove or even to introduce evidence that Mr. Smith could have avoided some of his damages by finding a better job than he did.

Alternatively, Panhandle asserts that Mr. Smith did actually find a better job because his pay was $12.50 an hour at the time of trial. The assertion ignores the fact that the trial judge did compare the value of Mr. Smith's job at Panhandle with the value of Mr. Smith's new job at the time of trial, but that he considered more than just the hourly wages in his determination of damages. The testimony showed that Mr. Smith's new job did not guarantee forty hours of work a week, that it was harder physical work, that it was outdoors, and that there was no collective bargaining agreement or individual contract, so that Mr. Smith's job security was greatly diminished. The trial judge reasonably concluded that Mr. Smith had found a job inferior to the one he had with Panhandle. Indeed, we see no purpose for a remand on the issue of damages, because we see no other basis on which to recompute damages that would be any more mathematically certain or reasonable than the method which the trial judge used. The parties certainly cannot wait eight years so that they can precisely determine just how much less time Mr. Smith gets to work. We would also still have the problem of just how to assign a value to the less mathematically ascertainable benefits which we referred to earlier.

The rules of law on recovery of damages for breach of contract have to be very flexible. As stated in 5 Corbin on Contracts, § 1002, at 33 (1964), "Their application in the infinite number of situations that arise is beyond question variable and uncertain. Even more than in the case of other rules of law, they must be regarded merely as guides to the court, leaving much to the individual feeling of the court created by the special circumstances of the particular case." We accept the way the trial judge applied the law to the facts of this case, and we see no reason to upset his factual determination of the amount of damages.

The district court had jurisdiction to hear the dispute and correctly decided that a contract did exist and had been breached. Its damage award was supported by sufficient evidence. We therefore affirm.

THOMAS, Justice, specially concurring and dissenting, with whom ROSE, Chief Justice, joins.

I agree with all that is said in the majority opinion with respect to the existence of a contract and the right of Smith to recover for breach of that contract. I cannot agree with the disposition made of the issue of Smith's damages dealt with under Part IV of the majority opinion, and I dissent therefrom.

It is interesting to note that the majority opinion correctly states the rule with respect to damages as follows:

"* * * In a suit for a breach of an employment contract, then, the damages are the amount of compensation agreed upon for the remainder of the period involved less the amount which the employee earned or with reasonable diligence could have earned from other employment."

The rule is stated thusly in 11 Williston on Contracts, § 1358, p. 302 (3d Ed., Baker, Voorhis & Co., Inc., 1968).

"* * * Therefore, in an action by the employee against the employer for a wrongful discharge, a deduction of the net amount of what the employee earned, or what he might reasonably have earned

in other employment of like nature, from what he would have received had there been no breach, furnishes the ordinary measure of damages [footnote 5 omitted]."

In footnote 5 cases are cited from 23 other jurisdictions without any contrary authority being noted.

Turning then to the facts as recited in the majority opinion, it appears that a value should be assigned to Smith's wages at Panhandle Eastern Pipeline Company of $12.53 an hour. This is based upon his hourly wage of $8.35 plus one-half of that amount for fringe benefits. As recited in the majority opinion, Smith was earning $12.50 an hour at the time of trial. Assuming a 40-hour week for 52 weeks a year, Smith would have been paid for 2,080 hours per year multiplied by an assumed continued period of employment with Panhandle Eastern Pipeline Company of 8 years. This is a total of 16,640 hours for which he would have been paid at Panhandle Eastern Pipeline Company $208,499.20. At $12.50 an hour for the same period, he would have earned $208,000.00.

I recognize that he did experience a period when he was not employed, and that his new job may not have resulted in a 40-hour work week in all instances. I would remand the case to the trial court for those value determinations, and having made the appropriate adjustments the trial court would then deduct his earnings at his new job for the 8-year period from the $208,-499.20 he would have earned at Panhandle Eastern Pipeline Company. It appears that that amount would be substantially less than the $40,000.00 which was awarded.

The majority opinion goes astray when it suggests that Smith selected a job that was qualitatively less desirable than his employment with Panhandle Eastern Pipeline Company. This qualitative difference might have excused Smith from accepting that employment. He would not then be chargeable with amounts he might have earned in a position substantially qualitatively less desirable than the one he had with Panhandle Eastern Pipeline Company.

Since he did accept the new employment the question of qualitative difference disappears under the rule of damages, and he must account for his actual earnings. I would hold that when the employee actually accepts new employment he is in effect conceding that there is no qualitative difference in the nature of the two employments, and the only matter to be accounted for is the actual difference in dollar value between the new employment and the old employment. In my view, the majority in this instance injects a classic speculative factor into the damage formula, and that should be avoided.

I find that in Webster's Third International Dictionary, Unabridged, page 1173 (G. & C. Mirriam Co., Publishers, 1961), one of the definitions of the word "intangible" is, "incapable of being defined or determined with certainty or precision: vague, elusive." Using this word to describe benefits lost by Smith, the majority concludes that the trial court was able to determine "the amount of damages with a reasonable degree of certainty." It seems to me that the rule is antithetical to the description of the benefits for which Smith is being compensated. This is confessed by the majority opinion in the sentence "We would also still have the problem of just how to assign a value to the less mathmatically ascertainable benefits which we referred to earlier." I am satisfied that the reason there is a problem is that Smith has been awarded damages which are speculative. In effect the court is supporting a holding that Smith's job with Panhandle Eastern Pipeline Company was worth $5,000 a year more than his actual compensation or, without supporting evidence, it is concluding that Smith's new employment somehow is worth $5,000 a year less than he apparently is being paid.

I would reverse and remand to the district court for a different computation of damages, while agreeing with the majority that the right to recover damages is present.