**ANDERSON EXCAVATING AND WRECKING COMPANY, a Nebraska corporation, Appellant (Defendant)**

v.

**CERTIFIED WELDING CORPORA-TION, a Wyoming corporation, Appellee (Plaintiff).**

No. 88–80.

Supreme Court of Wyoming.

Dec. 28, 1988.

As Corrected on Denial of Rehearing
Feb. 28, 1989.

J. Dudley Butler and Jamie Smith of Skiles, Hageman & Butler, Laramie, for appellant.

Mark A. Bishop of Lathrop, Rutledge & Boley, P.C., Cheyenne, for appellee.

Before CARDINE, C.J., and THOMAS, URBIGKIT, MACY and GOLDEN, JJ.

GOLDEN, Justice.

Appellant Anderson Excavating & Wrecking Company (Anderson) challenges the trial court's findings and judgment in a contract action. The underlying case involved a dispute between Anderson and appellee Certified Welding Corporation (Certified) over the terms of a lease agreement for a crane. After a bench trial, the trial court found that a contract existed between the parties and was evidenced by an unambiguous writing. It ruled generally in favor of Certified based on the terms of that written contract. Anderson argues that: (1) no contract existed; (2) the crane operator was Certified's employee and his negligence was the proximate cause of damage to the crane; (3) Anderson was not liable for the entire lease payment because Certified terminated the lease and the trial court calculated the damages incorrectly.

We affirm.

In April 1985, the vice president of Anderson, Mr. Lanny LaVelle, contacted the president of Certified, Mr. Don Chick, inquiring about leasing a crane. Anderson needed the crane for demolition work in Laramie, Wyoming. This initial telephone conversation resulted in an oral agreement that Certified would lease an eighty-two and one-half ton link-belt crane to Anderson at $6,500 per month for two months. Certified drafted a lease agreement including those terms, which was signed by Chick. The signed agreement was delivered to LaVelle on April 18, 1985. Gary Mills, a crane operator for Certified, transported the crane and the lease document to Laramie; the crane was used in Anderson's project on April 18, 19, and 22, 1985. LaVelle testified at trial that he reviewed the contract signed by Chick and telephoned Chick again to discuss the maximum hours the crane would be used per month and the hourly overtime rate for using the crane beyond that limitation. In that discussion, they agreed on several changes to those terms. Based on the additional negotiations, LaVelle changed the maximum hours term on the front of the lease document from 178 hours per month to 173 hours per month; LaVelle also altered the overtime rate term on the back of the lease document from $130 per hour to $38 per hour. LaVelle initialed both changes on the lease document and returned it to Chick. Chick reviewed the alterations made by Lavelle and initialed the change in the maximum hours term on the front of the lease document. He did not initial LaVelle's change to the overtime rate term on the back of the lease document.

Mills was provided with the crane by Certified under the lease document terms. On April 22, 1985, Mills was operating the crane for Anderson under the supervision of David Rogers, Anderson's superintendent. Mills was using the crane to pull down a steel truss so that it could be loaded into a railroad car. When Mills tried to grasp the truss with the bucket of the crane, the bucket slipped and recoiled into the boom of the crane. The boom was damaged and had to be replaced. Certified ordered and installed the new boom section at a cost of $15,503.22. The repairs were completed on May 1, 1985.

Certified tried for several days to get the name and address of Anderson's insurance company to file a claim for reimbursement on the crane repair. During a telephone conversation on April 29, 1985, an Anderson employee in Omaha, Nebraska, told Certified that Anderson would not pay for the repairs and that the crane should be removed from the job site in Laramie. Certified never received written notice to remove the crane, but complied with the oral notice and moved the crane back to Cheyenne on May 1, 1985. At that time, the crane was repaired and Certified was willing to continue under the terms of the lease agreement. Anderson never reimbursed Certified for the cost of repairs to the crane. LaVelle's partial explanation for this was that Anderson decided it should not have to pay for repairs to the

crane because it did not have its own crane operator controlling the equipment at the time of the accident. Anderson also refused to pay lease rental and operator's wages claimed by Certified under the lease and never provided Certified with certificates of insurance as the lease agreement required.

Certified filed a complaint alleging breach of the written lease agreement on June 19, 1986. Anderson answered and counterclaimed on July 28, 1986. Certified answered the counterclaim on August 6, 1986, and received leave of court to amend its complaint during the October 29, 1987, pretrial conference and on November 18, 1987, at the opening of the trial. The case was tried on November 18–19, 1987. On December 21, 1987, the court dismissed the counterclaim and entered a $28,756.12 judgment against Anderson.

## DID THE PARTIES CONTRACT?

■ Anderson's first issue questions whether the written lease agreement evidenced a valid contract between Anderson and Certified. A contract comes into being when there is a meeting of the minds concerning the terms of the agreement. *Jackson Hole Builders v. Piros*, 654 P.2d 120, 122 (Wyo.1982). The existence of a contract depends upon the intent of the parties and presents the trial court with a question of fact. *United States ex rel. Farmers Home Administration v. Redland*, 695 P.2d 1031, 1036 (Wyo.1985). On appellate review we defer to a trial court's findings of fact unless they are shown to be an abuse of trial court discretion. *Kennedy v. Kennedy*, 761 P.2d 995, 998 (Wyo.1988). See also *Martin v. State*, 720 P.2d 894, 897 (Wyo.1986) (defining judicial discretion).

■ Anderson argues that LaVelle's alterations of the original written lease agreement were not an acceptance of that offer, but instead created a counter offer that was never accepted by Certified in writing. We agree that no contract was formed when Lavelle signed the lease

agreement *after* he altered two of its terms. A party who will not accept an offer without a material alteration to its terms rejects the offer. *Panhandle Eastern Pipe Line Company v. Smith*, 637 P.2d 1020, 1023 (Wyo.1981). A material alteration of a contractual term is one that cannot be implied in the original offer. *Id.* If the party who modifies the original offer returns it to the original offeror for his acceptance, the modified offer becomes a counter offer that must be accepted unconditionally by the original offeror to create a contract.[1] It is undisputed that Chick sent the lease agreement to LaVelle and that LaVelle reviewed it. LaVelle then telephoned Chick and they negotiated two changes in its terms. After this negotiation LaVelle altered the document to reflect those changes, initialed the alterations, signed the lease agreement, and returned it to Chick. Since the two alterations could not have been implied in the original offer, they were material and modified the original offer. This modified offer became a counter offer by Anderson to Certified.

Anderson uses this conclusion to argue that Certified could accept the counter offer *only* if it did so in writing. Anderson urges that Chick's failure to initial *both* of LaVelle's alterations was a failure to accept in this alleged exclusive mode of acceptance and amounted to no acceptance at all. This is where we part company with Anderson.

In *Panhandle*, 637 P.2d at 1022, we made the following statement concerning the application of the exclusive mode of acceptance rule:

The offeror is the master of the offer, but we think fairness demands that when there is a dispute concerning mode of acceptance, the offer itself must clearly and definitely express an exclusive mode of acceptance. There must be no question that the offeror would accept the prescribed mode and only the prescribed mode. * * * The requirement [that of-

---

1. "An acceptance is still effective if the addition only asks for something that would be implied from the offer and is therefore immaterial."

*Panhandle Eastern Pipe Line Company v. Smith*, 637 P.2d 1020, 1023 (Wyo.1981).

feree just sign the offer and not add anything] strikes us as unreasonable, and strikes out as a prescribed mode of acceptance unless the offeror's intention is explicitly set out. We agree that the mode of acceptance rule ' * * * has been enforced with a rigor worthy of a better cause.' Calamari & Perillo, Contracts, § 2–22 (2d ed.1977). We are not eager to enforce it if there is any question about the mode of acceptance or about the clarity with which the demand was made.

The written agreement in this case did not require acceptance exclusively in writing. It already had Chick's signature on the only other signature line on the document as a result of the initial offer. No evidence exists in the record that LaVelle told Chick he must notify Anderson of Certified's return promise to perform, initial the alterations to the document, or sign it again. The document does not contain any express terms, or additional terms added by LaVelle, which explicitly require Chick to accept by return promise in writing. Cf. *Wheeler v. Woods*, 723 P.2d 1224, 1227 (Wyo.1986) (express requirement for acceptance in writing). Under our reasoning in *Panhandle* these facts create sufficient uncertainty about the proper mode of acceptance to compel us to hold that Certified was not bound to accept Anderson's counter offer in writing.

■ An offer which does not specify a mode of acceptance invites acceptance in any manner reasonable under the circumstances. *United Concrete Pipe Corporation v. Spin–Line Company*, 430 S.W.2d 360, 363–364 (Tex.1968) cited in *Thomas v. Reliance Insurance Co.*, 617 F.2d 122, 128 (5th Cir.1980); Restatement (Second) of Contracts § 32 at 89 (1981). Cf. *Spatz v. Mile–Hi Realty*, 589 P.2d 849, 852 (Wyo. 1979). The acceptance may be a return promise to perform or an actual performance; an acceptance by actual performance operates as a promise to render complete performance under the stated terms and forms a contract. *Pangarova v. Nichols*, 419 P.2d 688, 697 (Wyo.1966); *United Concrete*, 430 S.W.2d at 363–364; Restatement (Second) of Contracts § 62 at 149 (1981).

■ In this case, pursuant to a general telephone conversation the original written offer containing Chick's signature was delivered to LaVelle in Laramie on April 18, 1985. That offer was delivered to LaVelle by Chick's crane operator who had come to Laramie to deliver the crane and begin demolition work on Anderson's project. After reading Chick's written offer, LaVelle telephoned Chick during the evening of April 18, 1985, suggesting changes to the writing. The two men discussed the contract and LaVelle made two minor changes to the writing, signed and initialed the writing, and returned it to Chick as a counteroffer. Chick read the altered agreement, initialed one of the changes and apparently filed it. The crane began working when it arrived on April 18, 1985, and both parties performed under the terms of the written contract as evidenced by the altered writing LaVelle returned to Chick until the crane was damaged on April 22, 1985. Nothing in the record shows a rejection by Certified or a withdrawal of the counter offer by Anderson. Giving deference to the trial court's findings, we hold that Certified accepted the counter offer by performing under the terms of the lease agreement from April 18 through April 22, 1985. A contract was formed between the parties under these facts and its terms are evidenced by the written lease agreement, as altered, initialed, and signed by LaVelle. See *Farr v. Link*, 746 P.2d 431, 433 (Wyo. 1987).

## OPERATOR NEGLIGENCE

### Allocation of Risk of Loss

■ Anderson's next issue attempts to focus our attention on the alleged negligence of the crane operator. It argues that this operator was, in substance, an employee of Certified when the crane was damaged and his alleged negligence in causing the damage is attributable to Certified. Anderson cites as support for this theory several cases involving leases of cranes and other equipment, in which the lessor supplied the equipment operator and that operator's conduct was found to be the proximate cause of damage to the equip-

ment or injury to another person. See *Rocky Mountain Bridge Company v. Martin K. Eby Construction Company,* 543 P.2d 1288 (Colo.App.1975); *Great Western Sugar Company v. Erbes,* 148 Colo. 566, 367 P.2d 329 (1961); *Chartier v. Winslow Crane Service Company,* 142 Colo. 294, 350 P.2d 1044 (1960); *Foy–Proctor Co. v. Marshall & Thorn,* 169 Ky. 377, 183 S.W. 940 (1916).

Anderson's argument ignores the written lease agreement, and the cases it cites are similarly distinguishable on their facts. Anderson fails to recognize that the parties to this type of contract are free to allocate the risk of loss among themselves as they choose. *Allstar Video, Inc. v. Baeder,* 730 P.2d 796, 798–799 (Wyo.1986). Anderson cites no cases that involve written lease agreements containing an express allocation of risk of loss provision.

■ The written lease agreement between Anderson and Certified is a lease of personal property for a definite period of time for the mutual advantage of the parties, sometimes referred to as a bailment lease. *Fuchs v. Goe,* 62 Wyo. 134, 163 P.2d 783, 789, 166 A.L.R. 1329 (1945). See also 9 S. Williston, Williston on Contracts § 1041A at 927–928 (1967). In this type of lease, the bailee is generally held to a standard of ordinary care regarding the condition of the personal property involved. *Mazzola v. Sawyer,* 702 P.2d 167, 169 (Wyo.1985); *Fuchs,* 163 P.2d at 789. However, the parties to a bailment lease may specially contract to place the risk of loss or damage to bailed personal property on the bailee, essentially making bailee an insurer of the personalty. *Allstar Video,* 730 P.2d at 799; *Fuchs,* 163 P.2d at 789–790. "A special contract between the parties may either enlarge or limit the obligation of the bailee [to exercise ordinary care] as it ordinarily would be under the general law." *Fuchs,* 163 P.2d at 789. Such changes in a bailee's obligations to care for personal property under a bailment contract are enforceable only if they are expressed in "clear and explicit language." *Fuchs,* 163 P.2d at 790–791. See also *Allstar Video,* 730 P.2d at 798–799. The bailee's contractual duty to insure the personal property must arise from the plain meaning of the words used to limit the obligation. *Fuchs,* 163 P.2d at 791.

The express language of the written lease agreement in this case clearly and explicitly obligated Anderson to maintain insurance against risk of loss or damage to the crane, regardless of the cause. The second term of the written lease agreement evidencing the contract between Anderson and Certified provided:

> SECOND: *Lessee [Anderson] agrees to keep the equipment fully insured at all times against all risks of loss or damage from every cause whatsoever and Lessee shall carry public liability and property damage insurance covering the equipment in an amount sufficient to indemnify Lessor against any loss. All such insurance shall be in the name of both Lessor and Lessee, specifically naming Lessor as a co-insured.* The Proceeds of such insurance shall, at Lessor's option, be applied to repair, restore, or replace the equipment or toward Lessee's obligations hereunder. Lessee shall provide Lessor with certificates of insurance. (Emphasis added.)

This language obligates Anderson to insure the crane and to co-insure Certified against any loss from damage to the crane. This allocation of the risk of loss exists no matter who Anderson attempts to blame for damaging the crane.

### Anderson's Operator

■ Anderson's negligence allegation is further weakened when we review the propriety of the trial court's finding that the crane operator was Anderson's employee under the written contract and that he was under Anderson's control at the time the crane was damaged. While Anderson asserts that Mills was under Certified's control when the crane was damaged, it admits in its brief that it agreed to accept Certified's crane operator under the contract. The trial court accepted Chick's testimony concerning LaVelle's telephone call to Chick shortly after work began, asking if a different person could operate the crane. LaVelle did not complain about Mill's competence to operate the crane. When Chick expressed a preference for having Mills operate the crane, LaVelle agreed and the

conversation ended amicably. LaVelle also did not complain about Mills in writing. Based on this evidence the trial court found that Mills was controlled by Anderson when the crane was damaged.

By arguing questions of control, Anderson is trying to relitigate a factual issue that was properly decided at trial. Anderson has not shown an abuse of trial court discretion underlying this finding, and we defer to the trial court in that circumstance.

## ALLEGED TERMINATION AND DAMAGES

■ Anderson's final issue is essentially a facial challenge to the trial court's findings and conclusions that Anderson breached the lease agreement thereby entitling Certified to damages for repair of the crane and the payments due under the lease. The evidence at trial was overwhelming that Anderson breached the clear terms of the written contract in a number of ways. Based on properly supported findings of fact, the trial court concluded Anderson breached the contract by failing to: (1) insure the crane; (2) co-insure Certified against damage to the crane; (3) provide Certified with certificates of insurance; (4) replace the damaged crane or pay for the repairs; and, (5) pay the two monthly rental payments of $6,500. The trial court had more than enough evidence before it to find a breach by Anderson and award damages based on that breach. Anderson cannot relitigate proper findings of fact on appeal. We are also unpersuaded by Anderson's argument that Certified failed to mitigate its damages. Anderson's argument amounts to a request that this court infer a failure to mitigate in the absence of proof in the record. As the breaching party, Anderson is charged with the burden to prove its mitigation claim. See *Sturgeon v. Phifer*, 390 P.2d 727, 731 (Wyo.1964). It has failed to carry that burden.

AFFIRMED.